## IN THE IOWA DISTRICT COURT FOR KOSSUTH COUNTY

| | |
|---|---|
| PHARMACISTS MUTUAL INSURANCE COMPANY, | Case No. _____ |
| Plaintiff, | |
| v. | PETITION |
| NAMIC INSURANCE COMPANY, INC., | |
| Defendant. | |

COMES NOW the Plaintiff, Pharmacists Mutual Insurance Company (hereinafter "PHMIC"), by and through the undersigned counsel, and for its cause of action against the Defendant, NAMIC Insurance Company, Inc. (hereinafter "NAMICO"), states as follows:

1.      Plaintiff, Pharmacists Mutual Insurance Company, is an Iowa business entity engaged in the business of insurance with its principal place of business in Algona, Kossuth County, Iowa.

2.      Defendant, NAMIC Insurance Company, Inc., is an Indiana business entity engaged in the business of insurance, qualified to write insurance in the surplus lines market in Iowa and transacting business in Iowa.

3.      NAMICO is an insurance company that, among other things, offers Insurance Company Professional Liability Insurance and Directors and Officers Liability Insurance to mutual insurance companies like PHMIC.  NAMICO issued such a policy with PHMIC as named insured, NAMICO's Policy Number C01330015 ("NAMICO'S Policy").

4.      This action arises out NAMICO's breaches of obligations owed to PHMIC under NAMICO's Policy when NAMICO assumed the defense of PHMIC regarding claims and a lawsuit filed by Kimberly Schock against PHMIC.

5.      The Schock lawsuit against PHMIC was filed in the United States District Court for the District of Colorado, Civil Action No. 1:17-CV-597 (the "Underlying Action") and concerned PHMIC's handling of a claim by Schock under a policy of insurance PHMIC issued to Schock who was a Colorado resident.

6.      This case was originally filed, with extensive discovery and litigation in the United States District Court for the District of Colorado at No. 1:18-cv-00791-MSK-SKC.  However, in November of 2020 the Court dismissed the case without prejudice.

7.      This Court has jurisdiction over NAMICO. NAMICO's acceptance of contracted premiums for professional liability polices of insurance to protect PHMIC over many years, which polices were in place to cover PHMIC over the course of 15 plus years. NAMICO had ongoing business with and at PHMIC's offices in Kossuth County, Iowa. Over that period NAMICO handled approximately 50 claims related to PHMIC's business, including the Schock claim. Those claims were handled under polices of insurance which NAMICO issued with PHMIC as insured. While handling the Schock claim and the other claims against PHMIC, NAMICO had regular, systematic, and numerous contacts with PHMIC in Iowa by phone, email, and mail.  Further, NAMICO made a series of contracts with PHMIC, including the NAMICO Policy at issue here that was to be performed in Iowa and committed a tort in whole or in part in Iowa.  NAMICO is subject to jurisdiction in Iowa pursuant to Iowa Code Section 617.3(2) (2020).  The exercise of personal jurisdiction over NAMICO comports with all due process requirements.

8.      Venue is appropriate based upon the allegations herein, and the damages claimed exceed the jurisdictional limits of this Court.

## GENERAL ALLEGATIONS

2

9.      Attached hereto as <u>Exhibit 1</u> is a true and correct copy of the Schock complaint against PHMIC filed in the Underlying Action.

10.     Attached hereto as <u>Exhibit 2</u> is a true and correct copy of NAMICO's Policy. Certain confidential information has been redacted from <u>Exhibit 2</u>.

11.     Prior to the Underlying Action being filed Schock's counsel, by letter dated May 11, 2016, threatened bad faith arising out of a coverage dispute between PHMIC and Schock.

12.     The coverage dispute leading to the filing of the Underlying Action concerned whether Shock was entitled to a single $100,000 limit under her Uninsured/Underinsured Motorists coverage ("U/M coverage") or five $100,000 limits under the policy PHMIC issued with Schock and her husband as insured.

13.     Schock had sustained injuries in an automobile accident that occurred in Colorado and claimed personal injury damages against the PHMIC policy issued to Schock for more than $100,000 resulting from that accident.

14.     PHMIC initially erroneously informed Schock the limits under the PHMIC policy could stack so that there was a potential of $500,000 in coverage.

15.     On June 8, 2016 PHMIC notified Schock's counsel that there had been an error in the earlier PHMIC coverage analysis and that only $100,000 of coverage under the U/M coverage was available.

16.     PHMIC also tendered and paid the full amount of U/M coverage available to Schock of $100,000.

17.     Schock's counsel responded that PHMIC was acting in bad faith.

3

18.     Because of that bad faith assertion and before the Underlying Action was filed PHMIC notified NAMICO of Schock's claim and NAMICO, on June 24, 2016, assigned counsel at Wells Anderson Race ("WAR") to defend PHMIC from Schock's threatened claims.

19.     Despite the fact that only $100,000 of coverage was available PHMIC, in an effort to head off Schock's claim that PHMIC had acted in bad faith, PHMIC paid Schock an additional $117,618.94 on June 20, 2016, because of medical expenses Schock claimed to have incurred prior to being informed only $100,000 in U/M coverage was available under the PHMIC policy.

20.     NAMICO was aware or should have been aware from June 24, 2016 forward, when it accepted PHMIC's claim notice and assigned defense counsel to defend PHMIC from Schock's threatened claims, of PHMIC's subsequent payment of the $117,618.94 above PHMIC's U/M coverage limit of $100,000.

21.     The $117,618.94 PHMIC payment to Schock was made in good faith and to head off Schock's threatened bad faith and extra contractual damages claims.

22.     On March 6, 2017 Schock filed her complaint in the Underlying Action.

23.     In that complaint Schock asserted a claim for bad faith and threatened a claim for a statutory remedy under Colorado law for Unreasonable Delay/Denial of a Claim for Benefits. Those claims and threatened claims were covered claims under the NAMICO Policy, for which PHMIC paid premium sent to NAMICO from Kossuth County, Iowa.

24.     In addition, Schock asserted claims under the U/M coverage and for breach of contract.

25.     PHMIC answered and denied that any additional benefits were owed Schock under the PHMIC Policy.

4

26.     NAMICO was notified by WAR of the filing of the Schock Complaint in the Underlying Action on July 6, 2017.

27.     The Underlying Action presented a mixed bag of covered and potentially uncovered claims for which NAMICO owed PHMIC a defense and potential indemnification under the NAMICO Policy.

28.     NAMICO, as was its right and duty under the NAMICO Policy, accepted and controlled the defense of PHMIC in the Underlying Action. NAMICO did so without issuing a reservation of rights or informing PHMIC of coverage issues regarding the Schock claims asserted in the Underlying Action until after the Underlying Action was fully resolved by a settlement.

29.     NAMICO's own claim handling procedures provided a reservation of rights should have been issued within thirty days or no later than August 7, 2017.

30.     NAMICO's belated reservation of rights was not issued until November 2, 2017, which was too late.

31.     Because Schock's claim for U/M benefits was contrary to the plain language of the PHMIC policy issued to Schock, NAMICO's assigned defense counsel for PHMIC, WAR, filed a motion for partial summary judgment in the Underlying Action on that issue. The motion for partial summary judgment was filed September 22, 2017.

32.     In conjunction with the filing of that motion for partial summary judgment PHMIC and Schock participated in a settlement conference before the Honorable William Neighbors (Ret.) in September of 2017 in Denver, Colorado.

33.     A series of settlement offers were exchanged during the settlement conference which offers made on behalf of PHMIC were approved by Mr. Wruble for NAMCIO.  Schock's first demand to PHMIC at the settlement conference was $3,500,000.  Schock's lowest demand at

5

the settlement conference was $3,100,000.  The settlement conference did not result in a settlement of the Underlying Action.

34.     Following the unsuccessful settlement conference Schock, on September 28, 2017, issued a reduced settlement demand that had a short time limit before it expired (October 2, 2017 at 5 pm) and was within NAMICO's Policy limits. A true and correct copy of that Schock settlement demand is attached hereto as Exhibit 3.

35.     Schock's settlement demand contained no allocation between covered and potentially uncovered claims.

36.     NAMICO's retained Colorado defense counsel for PHMIC, WAR, recommended that the settlement demand be accepted. To support that recommendation NAMICO's retained defense counsel issued an updated case evaluation and litigation plan that was sent to NAMICO.

37.     PHMIC on September 29, 2017 demanded NAMICO agree to that settlement.

38.     Between September 29, 2017 and October 2, 2017 NAMICO's claims professional, Mr. Wruble, and his supervisor, Ms. Jennifer Hamilton, who became more involved on the handling of the Schock claim on October 2, 2017, because of the perceived exposure to NAMICO, had telephone calls and exchanged emails with their retained Colorado defense counsel so that NAMCIO could make the decision on whether to accept the Schock settlement demand.

39.     NAMICO, on October 2, 2017, after review of Colorado defense counsel's updated case evaluation, and after calls and emails with Colorado counsel, agreed to the settlement demand but stated its agreement to the settlement was subject to NAMICO's and PHMIC's future agreement upon "allocation and funding of" the settlement amount.

40.     PHMIC on October 3, 2017, before any further discussions on allocation of the settlement amount between covered and potentially uncovered claims offered to fund the settlement payment.

41.     No agreement as to allocation of the settlement amount was ever reached between NAMICO and PHMIC.

42.     On October 11, 2017, Schock executed a Confidential Release and Settlement Agreement.

43.     On October 12, 2017, PHMIC issued the full $1,000,000 payment owed to Schock under the agreed to settlement.

44.     The settlement agreement contains no admission of liability and no allocation of the amount paid in settlement between covered and potentially uncovered claims. A true and correct copy of the Confidential Release and Settlement Agreement is attached hereto as <u>Exhibit 4</u>.

45.     On October 18, 2017, and after PHMIC had advanced the amount owed Schock under the settlement, the parties to the Underlying Action filed a Stipulation of Dismissal of the Underlying Action.

46.     The court in the Underlying Action on October 20, 2017 ordered the Underlying Action Dismissed with prejudice. The Stipulation of Dismissal and Order contain no admission of liability and no allocation of the amount paid in settlement between covered and potentially uncovered claims. A true and correct copy of the Stipulation of Dismissal filed, and Order entered in the Underlying Action is attached hereto as <u>Exhibit 5</u>.

47.     Between June 24, 2016, when NAMICO was notified of the Schock claims and October 20, 2017, including through when NAMICO agreed to accept the Schock settlement

demand on October 2, 2017, despite having assumed and being in control of the defense of PHMIC in the Underlying Action, NAMICO never issued any writing advising PHMIC of NAMICO's coverage position on the Schock claims.

48.     Despite agreeing that the allocation of the amount being paid in settlement would be discussed after October 2, 2017, between October 3 and October 11, 2017 NAMICO unilaterally decided what portion of the Schock settlement it would require PHMIC pay and did not timely inform PHMIC of that decision.

49.     On October 13, 2017, Jennifer Hamilton for NAMICO and Ivy Kitzinger for PHMIC first discussed allocation of the Schock settlement by phone.  Ms. Hamilton then first informed Ms. Kitzinger what NAMICO was demanding that PHMIC pay as its portion of the settlement.  The amount NAMICO demanded PHMIC pay was the full amount of Schock's "contract claim," i.e., the Schock claim that was the subject of the pending summary judgment motion when the settlement was agreed to.

50.     Over the course of two phone calls between October 13 and October 25, 2017, Ms. Kitzinger and Ms. Hamilton discussed the fact that PHMIC did not agree with NAMICO's allocation.  Recognizing that disagreement and on behalf of PHMIC Ms. Kitzinger requested that Ms. Hamilton have NAMICO pay the undisputed portion of the settlement.

51.     By October 25, 2017, NAMICO's claim representatives Patrick Wruble and Jennifer Hamilton, knowing PHMIC disagreed with NAMICO's proposed allocation, agreed that they would inform Ms. Kitzinger that the "undisputed amount of the Schock settlement would be paid."  Mr. Wruble, on October 25, 2017, left Ms. Kitzinger a phone message that the undisputed portion of the settlement would be paid.

52.     When the court in the Underlying Action dismissed the claims with prejudice, it never ruled on PHMIC's pending motion for partial summary judgment. Therefore, the court in the Underlying Action never determined that the U/M coverage available to Schock exceeded $100,000.

53.     In determining that amount it would reimburse PHMIC, NAMICO, relying upon NAMICO Policy Exclusion I, asserted the full $500,000 in U/M benefits claimed by Schock was an "uncovered contract loss" and allocated $500,000 of the amount paid in settlement to this allegedly uncovered contract loss.

54.     That allocation was unreasonable.

55.     Based upon that unreasonable allocation, NAMICO has refused to reimburse PHMIC for that NAMICO allocated amount.

56.     NAMICO's explanation for its unilateral determination on the amount that would be reimbursed to PHMIC was set forth in a written "Reservation of Rights" letter dated November 2, 2017 ("ROR").  A true and correct copy of that ROR is attached hereto as Exhibit 6.

57.     To support NAMICO's determination of an allegedly "uncovered contract loss" NAMICO's Reservation of Rights letter stated, in relevant part:

"It therefore appears more likely than not that Schock had a viable contractual based claim (either based on the contract itself or promissory estoppels) or that PHMIC would have been estopped from asserting any anti-stacking language contract defense to the Schock claim. Schock's damages exceeded the $500,000 combined limits of her policy and she more likely than not would have received the full amount.

Accordingly, $500,000 of the amount paid in settlement of the claim is attributable to the contract-based damages. . . ."

9

58.     Further, NAMICO's reservation of rights letter, which accompanied a partial and incomplete payment of what NAMCIO owed PHMIC arising out of the agreed to Schock settlement, purported to reserve all of NAMICO's rights even though NAMICO had represented to PHMIC that NAMICO would pay what it considered the undisputed amount owed PHMIC arising out of the Schock settlement.

59.     NAMICO's unilateral, self-serving allocation of $500,000 of the settlement amount to an "uncovered contract loss" is based upon faulty reasoning, did not comport with the law in the Tenth Circuit or Colorado law, assumed that all of the benefits arising out of the settlement flow to NAMICO and therefore, breached NAMICO's obligations to PHMIC under the NAMICO Policy and under the common law.

60.     NAMCIO's actions as described above violated obligations NAMICO owed and when handling third-party insurance claims in Colorado.  When handling claims and a lawsuit against PHMIC in Colorado, NAMICO was and is obligated to comply with Colorado's Unfair Claims Act, C.R.S. §§ 10-3-1101 et seq. ("Act").

61.     NAMICO violated that Act in a number of ways including, but perhaps not limited to:  violating § 10-3-1104(1)(h) (III) C.R.S. (by a failure to implement reasonable standards for the prompt investigation of claims); violating § 10-3-1104(1)(h)(V) C.R.S. (by its failure to affirm or deny coverage within a reasonable time); by violating § 10-3-1104(1)(h)(VI) C.R.S. (by failing to pay the settlement or repay PHMIC for the settlement when liability is reasonably clear); and by violating § 10-3-1104(1)(h)(VII) C.R.S. (compelling PHMIC to file suit to recover what is owed under the NAMICO Policy).

62.     Iowa's Unfair Claims Practices Act, Section 507B.4 is substantially similar to the Colorado statutes. NAMICO's conduct also violated the requirements of Iowa's Act under Section 507B.3.

63.     NAMICO violated industry standards in the way it handled the Schock claim and the defense of PHMIC in the Underlying Action by:   (i) By failing to timely inform Pharmacists of any coverage issue relating to Schock's claim; (ii) By unreasonably allocating part of the Schock settlement as not covered; (iii) By unreasonably delaying payment of the full amount of Pharmacists' claim; and (iv) By compelling PHMIC to file suit to obtain payment.

## COUNT I

## BREACH OF CONTRACT

64.     The preceding allegations are incorporated by reference.

65.     PHMIC substantially performed its obligations under the NAMICO Policy or NAMICO waived the requirement that PHMIC comply with NAMCIO Policy conditions.

66.     NAMICO breached its obligations to PHMIC under the NAMICO Policy by not properly defending PHMIC in the Underlying Action and reimbursing to PHMIC what it was due under the NAMICO Policy.

67.     In doing so NAMICO improperly relied upon Exclusion I in the NAMICO Policy. To rely upon that exclusion NAMICO must establish that the exclusion was drafted in clear and specific language. To benefit from the exclusionary clause, NAMICO must also establish that the exclusion applies and is not subject to any other reasonable interpretation. Under that exacting standard Exclusion I does not exclude coverage for the amount paid in settlement of the Schock claims in the Underlying Action.

68.     Alternatively, NAMICO waived its right to rely upon Exclusion I because: (i) NAMICO had sufficient knowledge of the facts or circumstances to timely assert a reservation of rights based upon Exclusion I; (ii) in spite of this knowledge, NAMICO assumed the defense of PHMIC in the Underlying Action without obtaining an effective reservation of rights; and (iii) PHMIC suffered harm as a result of the NAMICO's assumption of PHMIC's defense.

69.     By these actions NAMICO has breached its obligations to PHMIC under NAMICO's Policy by failing to pay the settlement or re-pay PHMIC all amounts due under the settlement.

70.     That breach has caused PHMIC damages in an amount to be proven at trial.

WHEREFORE, Pharmacists Mutual Insurance Company respectfully prays that this Court enter judgment in its favor and against Defendant NAMIC Insurance Company, Inc., in an amount that will fully compensate PHMIC for all losses, plus interest, costs of this action, attorney fees, and for such other and further relief as the Court deems appropriate.

## COUNT II

## BAD FAITH

71.     The preceding allegations are incorporated by reference.

72.     NAMICO owed PHMIC a duty of good faith and fair dealing. In exercising this duty NAMICO stands in the position of a quasi-fiduciary to PHMIC. The duties of NAMICO to PHMIC extend not only to claim handling but to the entire relationship between NAMICO and PHMIC.

73.     NAMICO knowingly and maliciously or recklessly denied coverage to PHMIC without a reasonable basis and unreasonably breached its duties to PHMIC by concluding that NAMICO could, after-the-fact, allocate $500,000 of the amount paid in settlement to Schock to

allegedly uncovered contract damages and, based upon that allocation, refuse to pay benefits due under NAMICO's Policy; by failing to promptly provide a reasonable explanation of the basis of NAMICO 's coverage position on the Schock claims before PHMIC agreed to accept that settlement demand and before PHMIC funded that settlement; and by forcing PHMIC to file suit against NAMICO to recover benefits owed PHMIC under NAMICO's Policy.

74.    NAMICO's unreasonable actions and omissions caused PHMIC damages in an amount to be determined at trial which damages include incidental and consequential damages, costs, expenses, attorney fees and all other damages allowed by law.

WHEREFORE, Pharmacists Mutual Insurance Company respectfully prays that this Court enter judgment in its favor and against Defendant NAMIC Insurance Company, Inc., in an amount that will fully compensate PHMIC for all losses, plus interest, costs of this action, attorney fees, and for such other and further relief as the Court deems appropriate.

WHITFIELD & EDDY, P.L.C.
699 Walnut St., Suite 2000
Des Moines, IA  50309
Telephone:  (515) 288-6041
Fax:  (515) 246-1474
Email: Gentsch@whitfieldlaw.com


By */s/ Drew J. Gentsch*
        Drew J. Gentsch

ATTORNEYS FOR PHARMACISTS MUTUAL
INSURANCE COMPANY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:  1:17-CV-592

KIMBERLY SCHOCK,                    )
                                    )
    Plaintiff,                      )
                                    )
v.                                  )
                                    )
PHARMACISTS MUTUAL                  )
INSURANCE COMPANY                   )
                                    )
    Defendant.                      )
                                    )

---

## CIVIL COMPLAINT AND JURY DEMAND

---

The Plaintiff, Kimberly Schock, by and through her undersigned attorneys, ZANER HARDEN LAW, LLP, hereby submits the following Civil Complaint and Jury Demand and asserts:

## JURISDICTION AND VENUE

1.    At all times relevant to this action, Plaintiff Kimberly Schock (hereinafter "Plaintiff") resided in Colorado.

2.    Upon information and belief, at all times relevant to this action, Defendant Pharmacists Mutual Insurance Company (hereinafter, "Defendant") was and is an Iowa corporation licensed to do business in the State of Colorado.

3.    At all relevant times, Defendant purposefully availed itself of the privilege of conducting business in the State of Colorado.

4.    Defendant maintains a registered agent for service in Denver Colorado: C T Corporation System, 1675 Broadway, Suite 1200, Denver, Colorado 80202.

5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is a civil action in which the parties are citizens of different states.

6.    Venue is proper in the U.S. District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b) as this is a District in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

EXHIBIT

*1*

## FACTUAL ALLEGATIONS

7.     On or about March 6, 2014, Plaintiff and Stuart Hyma (hereinafter, "Hyma") were involved in a motor vehicle collision at or about the 9400 Block of Interstate 70 westbound.

8.     Plaintiff was driving a 2004 Ford F-350 (hereinafter, the "Ford") and was proceeding westbound on Interstate 70, in the exit lane for Kipling Street.

9.     Hyma was driving a 2002 Chevrolet Silverado (hereinafter, the "Chevrolet") and was traveling westbound on Interstate 70, in the exit lane for Kipling Street.

10.     Hyma failed to pay attention to the traffic ahead and drove the Chevrolet into the rear of the Ford, driven by Plaintiff.

11.     When Hyma caused the Chevrolet to collide with the Ford, he drove in a careless and imprudent manner, failing to take into account the safety of others, particularly Plaintiff.

12.     Plaintiff suffered physical injuries as a result of the aforementioned collision and underwent medical treatment.

13.     Plaintiff was not comparatively negligent at the time of the collision.

14.     Plaintiff did not cause the aforementioned collision.

15.     Plaintiff was wearing a seatbelt at the time of the aforementioned collision.

16.     As a direct and proximate result of Hyma's negligence, Plaintiff incurred past and future economic expenses, losses and damages, including, but not limited to, past and future medical expenses, loss of income, and other economic losses.

17.     As a direct and proximate result of Hyma's negligence, Plaintiff suffered in the past, and will continue to suffer in the future, non-economic damages including, but not limited to, pain and suffering, loss of enjoyment of life, inconvenience, emotional stress and impairment of quality of life.

18.     As a direct and proximate result of Hyma's negligence, Plaintiff has suffered physical impairment.

### *Hyma was an Uninsured Motorist Pursuant to Plaintiff's Policy with Defendant*

19.     At the scene of the collision, Hyma produced insurance information related to a policy with Shelter Insurance Company, Policy No. 05179381187.

20.     Upon information and belief, the named insured on the Shelter policy is Gabriel Davis (hereinafter, "Davis"); Davis is the owner of Alpine Heavy Duty Repair, L.L.C. (hereinafter, "Alpine"); Alpine was Hyma's employer at the time of the crash.

2

21.  On March 11, 2014, Shelter sent Plaintiff a letter stating, "Shelter's investigation revealed that there is no coverage for this loss. Because there is no coverage, we will be unable to pay for your loss."

22.  In another letter August 5, 2015, Shelter again confirmed that Shelter would not be providing any coverage for Plaintiff's loss.

23.  In a third letter dated August 27, 2015, Shelter explained that the reason why there would be no coverage for Plaintiff's losses is because "Hyma . . . is an excluded driver on policy 05-1-7938118-7."

24.  Hyma did not produce any of his own automobile insurance information.

25.  At the time of the crash, Hyma was not covered under any bodily injury automobile insurance as defined by Plaintiff's uninsured motorist coverage insurance policy (hereinafter, "the Policy") with Defendant. Nor did Hyma have a valid driver's license.

26.  Specifically, the Policy states that an "uninsured motor vehicle" is one "to which no bodily injury liability bond or policy applies at the time of the accident."

27.  The Policy also defines an "uninsured motor vehicle" as one "to which a bodily injury liability bond or policy applies at the time of the accident but the bonding or insuring company denies coverage."

28.  The only insurer who potentially could have provided bodily injury coverage on the Chevrolet being driven by Hyma, Shelter, denied coverage.

29.  The Chevrolet was an "uninsured motor vehicle" pursuant to Plaintiff's Policy with Defendant.

30.  Hyma was an uninsured motorist at the time of the aforementioned collision, maintaining no coverage necessary to compensate Plaintiff for her injuries and damages caused by Hyma's negligence.

***Plaintiff Files Suit Against the Motor Vehicle Accident Tortfeasors and Eventually Recovers***
***Under a "Garage" Insurance Policy***

31.  On March 3, 2016, Plaintiff filed suit in Denver County Court, 2016CV30752, against Hyma, Alpine, and Davis, alleging negligence, negligence *per se*, vicarious liability, and negligent hiring, training, retention, and supervision against the various defendants in this litigation.

32.  As litigation commenced, various insurance companies hired counsel under a reservation of rights for Hyma, Alpine, and Davis.

33.  In that litigation, it was revealed the Alpine was covered under a "garage" policy, (hereinafter, "the Garage Policy") through Farmers Insurance which covered Alpine's garage operations as well as Alpine employees while such employees were in the course and scope of their

3

employment with Alpine. The Garage Policy is not a bodily injury policy as contemplated by Plaintiff's insurance contract, the Policy, with Defendant.

34.    However, Alpine denied that Hyma was in the course and scope of his employment with Alpine at the time of the motor vehicle accident and therefore the Garage Policy provided no coverage for this incident.

35.    Instead, Alpine claimed that Hyma stole the Chevrolet and was driving it without Alpine's permission.

36.    The insurer for the Garage Policy, Farmers Insurance Exchange, issued a coverage opinion letter which, in part, stated that coverage would only apply if Hyma was in the course and scope of his employment with Alpine when the crash occurred.

37.    Plaintiff asserted that Hyma was, in fact, in the course and scope of his employment with Alpine when the crash occurred and presented disputed evidence that he was in the course and scope of his employment with Alpine at the time of the crash.

38.    Alpine continued to deny that Hyma was in the course and scope of his employment at the time of the crash.

39.    In December 2016, after several discovery disputes and alleged discovery violations by Davis and Alpine – including a hearing where the Court invited Plaintiff to file a motion for a variety of sanctions including striking pleadings – Farmers Insurance Exchange (the insurer of the Garage Policy) offered a settlement of $500,000.00.  Alpine and Davis did not admit liability or that Hyma was in the course and scope of his employment with Alpine at the time of the crash.

40.    Although Plaintiff believed that consent to settle with Farmers, the insurer of the Garage Policy, was not required, since the policy was a garage policy and not a bodily injury policy, Plaintiff, in an abundance of caution, sought consent to settle with Farmers from Defendant.

41.    On December 15, 2016, Defendant's legal counsel expressly agreed that the Garage Policy is not a bodily injury policy and therefore Plaintiff did not, in fact, require consent from Defendant to settle with Farmers.

42.    Defendant also added, however, that it did not object to the proposed settlement with Farmers.

43.    Therefore, Plaintiff accepted Farmers' settlement offer and that litigation was dismissed with prejudice.

44.    Plaintiff also resolved all outstanding medical treatment subrogation interests after settling with Farmers under the Garage Policy.

45.    As discussed above, under the Policy, an "uninsured motor vehicle" is a vehicle to which "no bodily injury liability bond or policy applies at the time of the accident."

4

46.     The Garage Policy insured by Farmers Insurance Exchange was not a bodily injury policy and therefore Hyma was still the driver of an uninsured motor vehicle under the terms of Plaintiff's insurance contract, the Policy, with Defendant, maintaining no coverage necessary to compensate Plaintiff for her injuries and damages caused by Hyma's negligence.

### Plaintiff Maintained $500,000.00 in Uninsured Motorist Coverage with Defendant Pursuant to Defendant's Own Admissions

47.     At the time of the incident, Plaintiff was insured by Defendant for Uninsured Motorist Benefits (hereinafter "UM Benefits") in the amount of $500,000.00 under policy number APV0061202, the Policy.

48.     Defendant received premium payments from Plaintiff over substantial time in exchange for insurance coverage under the Policy, including UM Benefits.

49.     As an insured for UM Benefits under the Policy, Plaintiff is entitled to recover UM Benefits directly from her insurance company, Defendant, in the case that an uninsured and negligent driver, such as Hyma, injured her.

50.     Plaintiff required medical treatment as a result of the negligent driving of Hyma.

51.     Plaintiff is entitled to UM Benefits for her injuries, damages, and losses as pursuant to her contract with Defendant and C.R.S. § 10-4-609.

52.     Plaintiff's counsel sent a Letter of Representation to Defendant on March 20, 2014. Therein, Plaintiff's counsel requested "completed certified copies, including Declaration pages, of all automobile insurance policies, umbrella policies, and excess coverage policies issued to my client and/or the members of my client's household that were in effect on the above-referenced date of loss."

53.     Prior to making any formal request for UM Benefits, Plaintiff engaged in extensive communications with Defendant regarding the amount of UM Benefits available to her under the Policy.

54.     On December 18, 2014, Defendant confirmed in a telephone call to Plaintiff's office that Plaintiff's UM Benefits "stacked" as there were multiple vehicles on the Policy. Specifically, since Plaintiff insured five vehicles with Defendant, each carrying $100,000.00 in UM Benefits, Plaintiff could "stack" the coverage available on each vehicle and therefore had $500,000.00 in UM Benefits available to her.

55.     Defendant confirmed for a second time that Plaintiff's UM Benefits stacked in a telephone call with Plaintiff's office on May 21, 2015.

56.     Defendant confirmed for a third and fourth time that Plaintiff's UM Benefits stacked during two telephone calls with Plaintiff's office on May 26, 2015.

57.     In a letter dated May 26, 2015 that memorialized these four telephone calls, Plaintiff's counsel stated that Defendant had "previously advised me on the telephone that my client, Kim

5

Schock, has five UIM policies that stack for a total of $500,000.00 in coverage. I have reviewed the policies and concur with your company's coverage determination."

58.     In that May 26, 2015 letter, Plaintiff's counsel requested "confirmation of this amount of coverage in writing."

59.     In a letter dated May 26, 2015, Defendant memorialized these multiple discussions that Plaintiff's UM Benefits stacked in written correspondence to Plaintiff:

Date: 5/26/2015  Time: 3:35 PM  To: 37595 37905,24690479 @ 13935635351
              Page: 001

# Pharmacists
# Mutual Companies

- Pharmacists Mutual Insurance Company
- Pharmacists Life Insurance Company
- PMC Advantage Insurance Services Inc.

| | |
|---|---|
| To | Jenny - Zaret Harden Law |
| Fax # | 13935635351 |
| | |
| Sender | Linda Feldmann |
| Phone# | 1-800-247-5930 ext 7354 |
| Fax # | 515-295-4321 |
| | |
| Date | 5/26/2015 |
| Time | 3:34 PM |
| Pages | 5 |

Subject: Kim Schock, Claim 10134194

Notes: Attached is a copy of the estimate of damage for Ms. Schock's vehicle. Also be advised that we have determined stacking of her UM/UIM limits is allowed as we had discussed previously. Thank you.

60.     Plaintiff relied on these multiple verbal and written confirmations regarding the amount of available UM Benefits in seeking medical treatment for injuries she sustained in the crash, as well as funding for that treatment.

6

61.    Had Defendant informed Plaintiff that there was only $100,000.00 in coverage, Plaintiff would have settled her claim at this time. She would not have financed several hundred thousands of dollars of treatment with a medical finance company.

62.    However, based on this representation, Plaintiff utilized a medical finance company to fund her treatment to see the world-renowned neurosurgeon Chad Prusmack, M.D. Plaintiff incurred hundreds of thousands of dollars of debt based on this representation.

### Plaintiff's Request for UM Benefits

63.    On January 20, 2016, Plaintiff made a request to Defendant for UM Benefits. Specifically, Plaintiff requested the "full policy limits of $500,000.00."

64.    Plaintiff attached extensive medical records from ten (10) medical care providers to her request, including records and bills from: Panorama Orthopedics, Panorama Physical Therapy, Golden Ridge Surgery Center, Rocky Mountain Spine Clinic, Bennett Mechanic, M.D., Surgery Center at Dry Creek, and A. Fox Physical Therapy.

65.    Further, in addition to including a computation of her past and future medical bills (which were, at the time, $217,618.94 and $12,167.00, respectively) Plaintiff explained to Defendant the catastrophic effect the crash had upon her life.

66.    Plaintiff informed Defendant "following the collision, [Plaintiff] experienced difficulty with all types of physical activity and severe limitations performing her professional job."

67.    Plaintiff informed Defendant that while she was once a "healthy, active woman with no relevant medical history," since the crash "her life is now completely unrecognizable to her."

68.    Plaintiff told Defendant about her "excruciating pain and numbness" in her hand, "daily headaches, and difficulty with walking and balance."

69.    Plaintiff explained to Defendant that the crash had severe impacts on her "life and responsibilities as a wife, mother, grandmother, and homemaker," as she was unable to perform the most basic household tasks or enjoy once-loving relationships with her husband and grandchild.

70.    On February 18, 2016, nearly **one month** after sending Defendant her request for UM Benefits, Defendant informed Plaintiff that it had retained attorney Peter Doherty, Esq. (who has now been replaced by other counsel) to "take a look at the file."

71.    In this same communication of February 18, 2016, Defendant stated that it was still getting a "better understanding of [Plaintiff's] *alleged* injuries resulting from this accident" (emphasis added).

72.    Defendant did not present any sort of timeline as to when Defendant would be providing a response to Plaintiff's request for UM Benefits, despite hiring outside counsel and having all of Plaintiff's medical records at its disposal.

7

73. On March 2, 2016, more than two weeks after first hiring outside counsel, Defendant requested additional medical records and authorizations from Plaintiff.

74. In a separate correspondence from March 2, 2016, Defendant asserted four different reasons from Plaintiff's prior medical records as alleged reasons why Defendant could not "respond to the current demand."

75. Some of the conditions Defendant cited included conditions and injuries unrelated to the crash of March 6, 2014, including "heart burn" and "indigestion."

76. The most recent medical record cited by Defendant in support of its argument that additional time was needed to evaluate Plaintiff's request was from June 4, 2012, nearly two years before the crash of March 6, 2014.

77. On March 21, 2016, Plaintiff's counsel wrote to Defendant, requesting an update on how the evaluation of Plaintiff's claim was proceeding.

78. On March 21, 2016, in response to Plaintiff's correspondence, Defendant explained that there had been a two-week delay in evaluating the claim because Defendant had hired "a local neurologist to assist with the review of the medical records" who was booked up since being retained by Defendant.

79. Defendant failed to inform Plaintiff that it had retained outside medical professionals – or that this counsel would delay the evaluation of Plaintiff's claim by at least another two weeks – until being asked by Plaintiff's counsel.

80. Defendant promised to provide "an estimate as to a time frame" in that same March 21, 2016 correspondence when Defendant would be able to respond to Plaintiff's claim for UM benefits.

81. Defendant never provided this promised timeline of when it expected to be done evaluating Plaintiff's request for UM benefits.

82. On April 13, 2016, Plaintiff's counsel requested another update on Defendant's evaluation of Plaintiff's claim.

83. On April 14, 2016, Defendant informed Plaintiff that it had received medical records from various medical providers (Golden Ridge Surgery Center, Panorama Orthopedics, Rocky Mountain Spine Clinic, Surgery Center on Dry Creek, and Colorado Rehabilitation & Occupational Medicine), all of which had been previously sent to Defendant by Plaintiff.

84. Defendant stated that it was still either "missing" or "waiting on" additional medical records.

85. The medical records Defendant stated it was still "missing" or "waiting on" had already been sent to Defendant by Plaintiff on January 20, 2016.

8

86.     On April 19, 2016, Plaintiff's counsel informed Defendant that besides records for a single visit to Panorama Orthopedics, "these records appear complete." Plaintiff agreed to sign an additional release form for this Panorama Orthopedics record.

87.     On May 6, 2016, Defendant notified Plaintiff that it was still "waiting on records" from three additional medical care providers.

88.     All of these records referenced in Defendant's May 6, 2016 correspondence had already been sent to Defendant by Plaintiff on January 20, 2016.

89.     On May 11, 2016, Plaintiff informed Defendant that all of the medical records which Defendant claimed to be missing had "already been provided" to Defendant more than "three months ago."

90.     In this correspondence, Plaintiff pointed out to Defendant that the only reasons why Defendant would be re-requesting records already sent to it by Plaintiff was because (1) Defendant was unreasonably delaying Plaintiff's claim; or (2) Defendant believed that, despite providing these medical records free from any redactions, Plaintiff had "surreptitiously removed individual records."

91.     Therein, Plaintiff reminded Defendant that despite receiving a Letter of Representation from Plaintiff's counsel on March 20, 2014, Defendant had taken no steps to begin evaluating her claim at that time, such as ordering her records.

92.     Similarly, Plaintiff reminded Defendant of its duties under Colorado law to (1) forward payment for undisputed medical bills; and (2) treat Plaintiff and her claim in good faith given the "special nature" of the relationship between Plaintiff and her own insurer, Defendant.

93.     On May 17, 2016, counsel for Defendant informed Plaintiff that Defendant would be reaching out to Plaintiff's counsel regarding the letter from Plaintiff dated May 11, 2016.

94.     On May 19, 2016, Defendant informed Plaintiff that it still had not received records from another medical care provider, Kaiser Permanente.

95.     On May 19, 2016, Plaintiff's counsel informed Defendant that, again, all these records had been provided to Defendant "four months ago."

96.     In that same correspondence, Plaintiff also requested an update as to when Defendant had sent in its own requests for these medical records.

97.     Plaintiff's counsel further stated to Defendant that in order "to speed things up," Plaintiff would send Defendant "the very same records" that Defendant said it was still missing.

98.     Plaintiff sent Defendant the records the same day as Defendant's correspondence, May 19, 2016.

### *Defendant's Denial of Benefits and Agreement that $500,000.00 in Coverage Existed*

9

99.     On May 19, 2016, Defendant provided Plaintiff with an initial offer of $283,000.00. Defendant explained that "[t]his amount is inclusive of the $217,618.94 in medical presented to us in your January 20, 2016 demand, for which we would like to forward payment, regardless of whether we have a global settlement at this time."

100.    In a phone call, Defendant's Claims Examiner Melissa Divis stated that the doctor who performed Defendant's independent medical records review confirmed that *all* of Plaintiff's submitted treatment was in fact related to the crash.

101.    The remaining $65,381.06 presumably accounted for Plaintiff's pain and suffering.

102.    Despite offering to forward payment for Plaintiff's medical bills, Defendant asserted without specific reference to any medical records that some of Plaintiff's injuries were "preexisting."

103.    Defendant also admitted that many of the "records obtained by release are largely duplicates."

104.    On May 20, 2016, Defendant's counsel sent Plaintiff a bullet-pointed letter outlining its timeline of when various medical records had been requested and received, as well as explaining which records Defendant was still missing.

105.    On May 27, 2016 in response to Defendant's correspondence and offer of May 19, 2016, Plaintiff agreed to accept $217,618.94 as "payment of non-disputed medical bills," but that in accepting this amount Plaintiff and Defendant "by no means [had] a full settlement."

106.    In this correspondence, Plaintiff pointed out that even in offering $283,000.00, Defendant still took this opportunity to "challenge [Plaintiff's] damages" instead of "showing any compassion for what your own insured has gone through the past two difficult years (and all of the future pain and suffering she will endure)."

107.    In Plaintiff's correspondence of May 27, 2016, Plaintiff also addressed Defendant's letter of May 20, 2016. Specifically, Plaintiff stated that while she appreciated the detail of this letter, Defendant had failed to address the underlying issue of why Defendant was re-requesting the exact same medical records which had already been provided by Plaintiff.

108.    Despite the duplicative nature of Defendant's actions, Plaintiff reminded Defendant that she had always promptly complied with Defendant's requests for medical records release authorizations.

109.    On June 2, 2016, Defendant confirmed receipt of Plaintiff's May 27, 2016 letter but stated that it was requesting additional records from Dr. Chad Prusmack's office.

110.    On June 2, 2016, Plaintiff agreed to forward Defendant copies of these records that Defendant stated it was missing.

111.    In that correspondence, Plaintiff informed that despite agreeing to send Defendant these missing records, such records "are not necessary to evaluate [Plaintiff's] damages which are in excess of her policy benefits."

10

112. Later on June 2, 2016, Plaintiff's counsel informed Defendant that Defendant's "constant delaying by requesting records you already have or don't need to make a fair evaluation is causing your insured [Plaintiff] significant and unnecessary stress."

113. Plaintiff's counsel reminded Defendant that the independent medical evaluation of Plaintiff's medical records "confirmed all of [Plaintiff's] medical treatment is related."

114. In a separate correspondence on June 2, 2016, Plaintiff forwarded Defendant medical records indicating that Dr. Prusmack would be performing another fusion surgery, this time of Plaintiff's lumbar spine. This fusion would cost more than one hundred thousand dollars and would subject Plaintiff to further pain and suffering.

115. During the course of these negotiations, Defendant agreed, both implicitly and explicitly, that the coverage available was, in fact, $500,000.00.

### *Defendant Reverses its Consistent Position of the Past Eighteen Months*

116. On June 8, 2016, Defendant informed Plaintiff that, despite oral and written confirmation and six months of negotiation based upon $500,000.00 in available UM coverage, "it has been determined that the UM is *not* subject to stacking[.]" (Emphasis added).

117. Within this self-serving proclamation, Defendant stated, "In light of our recent coverage analysis, we are withdrawing our previous settlement offer of $283,000 and will tender the UM limit of $100,000.00."

118. Defendant also stated in the June 8, 2016 correspondence that Plaintiff would be required to execute a release.

119. Plaintiff responded to Defendant's letter of June 8, 2016 on that same day.

120. In her letter of June 8, 2016, Plaintiff stated that Defendant's "cursory e-mail comes well over two years since [Defendant] has been aware of [Plaintiff's] UM claim, and, more importantly, *expressly* contravenes a facsimile we received . . . on May 26, 2015" which confirmed that that the Policy does, in fact, stack.

121. Plaintiff reminded Defendant that not only did Defendant confirm stacking in writing, but also that the letter memorialized several discussions in which Defendant stated that Plaintiff's Policy stacked.

122. Plaintiff stated that she detrimentally relied upon Defendant's representation regarding stacking in seeking medical treatment in excess of $100,000.00.

123. Defendant also relied upon its own representation regarding stacking, as it had offered approximately $217,000 in medical bills and $283,000 in a global settlement, both of which are in excess of $100,000.00.

11

124. Defendant's statement that only $100,000.00 in coverage existed under the Policy caused and continues to cause Plaintiff fear, anxiety, stress, and uncertainty that she will be personally liable for hundreds of thousands of dollars in medical care, and will be uncompensated for the multitude of pain and suffering she has endured since the crash.

125. In her letter of June 8, 2016, Plaintiff expressed surprise that "when it's time to finally pay her [UM] benefits, [Defendant] reversed course and, to its own benefit, decides that the policy is only worth $100,000.00."

126. On June 10, 2016, Defendant called Plaintiff's counsel to apologize for the "mistake" that Defendant had made.

127. Defendant attempted to shift the blame for this mistake to its own Claims Examiner, Linda Echevarria, the first adjuster assigned to Plaintiff's claim with Defendant, by claiming that the decision on stacking "was above her pay grade."

128. At no time was Ms. Echevarria acting outside the course and scope of her employment with Defendant when she assured Plaintiff on half a dozen occasions that the policies did, in fact, stack.

129. Despite having notice of the claim for years, and underwriting the Policy for even longer, Defendant did not take the position that, until only one week prior to June 10, 2016, the Policy was non-stacking in nature.

130. Additionally, Defendant informed Plaintiff's counsel that it was retaining *additional* counsel to evaluate numerous potential claims for relief set forth in Plaintiff's letter of June 8, 2016. Taking an adversarial position, Defendant stated that it "was not worried" about defeating any of these claims "besides the estoppel claim."

131. On June 13, 2016, Plaintiff sent Defendant correspondence that memorialized the conversation of June 10, 2016.

132. Plaintiff expressed disappointment that Defendant was delaying evaluation of her claim by claiming that a key claim manager was "on a fishing trip," since Defendant had all the information it needed to make its decision nearly six months prior.

133. Plaintiff asserted that Defendant was "taking a directly adversarial position to its insured" by actively seeking multiple ways to "defeat its insured's claim."

134. Defendant opted to expend further time and money on hiring additional counsel to evaluate its legal exposure in stating that the Policy was non-stacking after initially represented that the Policy stacked.

135. On June 15, 2016, Defendant informed Plaintiff that Defendant would be standing by its determination that only $100,000.00 in UM coverage was available to Plaintiff.

*Defendant's Inconsistent Behavior Continues*

12

136.    Despite stating that only $100,000.00 in UM coverage existed, Defendant still offered Plaintiff $217,618.94 due to Defendant's "error." These inconsistent positions serve as tacit acknowledgment by Defendant that it was continuing to act in bad faith.

137.    On June 23, 2016, Defendant sent Plaintiff correspondence explaining again that while "the correct limit of available UIM coverage purchased by [Plaintiff] totals only $100,000," Defendant would be sending Plaintiff a total of $217,618.94 for "expenses that *appear* to be reasonably related to the motor vehicle accident." (Emphasis added).

138.    In this June 23, 2016 correspondence, Defendant admitted that "a mistake was made in 2015 when Pharmacists Mutual conveyed information that the coverages are stacked to total $500,000.00."

139.    In response to this correspondence, on June 23, 2016, Plaintiff agreed to accept $217,618.94 being tendered by Defendant, but clarified that this amount was only "as a partial payment for her medical bills and by no means in exchange for any kind of waiver."

140.    In an e-mail from Plaintiff sent that same day, June 23, 2016, Plaintiff stated her counsel's position has "always remained the same – that there is [$500,000.00] in coverage."

141.    Plaintiff further asserted that the payment of approximately $217,000.00 in undisputed medical bills was "only a small fraction of what her damages actually are."

## FIRST CLAIM FOR RELIEF
### Uninsured/Underinsured Motorist Benefits

142.    Plaintiff incorporates herein by this reference, the allegations contained in Paragraphs 1 through 141 of this Complaint, as if set forth *verbatim*.

143.    At the time of the aforementioned collision, the Plaintiff qualified as an "insured" for purposes of a contract of insurance, the Policy, with Defendant.

144.    The Policy included a provision for uninsured/underinsured motorist bodily injury coverage, which provides that Defendant will pay for damages and bodily injuries sustained by Plaintiff if injured by a negligent uninsured driver.

145.    Hyma was a negligent uninsured/underinsured driver for purposes of UM Benefits owed to Plaintiff under the terms of the Policy and the Chevrolet he was driving was an uninsured vehicle.

146. .   Plaintiff has satisfied all conditions precedent under the Policy and she is eligible to recover UM/UIM benefits under the Policy.

147.    Defendant is liable for Plaintiffs' injuries and damages, as described above, caused by the uninsured driver in accordance with the provisions of C.R.S. § 10-4-609.

## SECOND CLAIM FOR RELIEF
### Breach of Contract

13

026

PH0113

148. Plaintiff incorporates herein by this reference, the allegations contained in Paragraphs 1 through 147 of this Complaint, as if set forth *verbatim*.

149. The Policy was in full force and effect on the date and time that Plaintiff suffered injuries in the aforementioned collision.

150. Defendant unreasonably failed to pay Plaintiff's claims that were made pursuant to the applicable Policy.

151. Defendant breached its contractual duty owed Plaintiff.

152. Plaintiff is entitled to damages allowed by law for breach of contract against Defendant.

## THIRD CLAIM FOR RELIEF
### Unreasonable Delay/Denial of a Claim for Benefits
### Pursuant to C.R.S. §§ 10-3-1115-1116

153. Plaintiff incorporates herein by this reference the allegations contained in Paragraphs 1 through 152 of this Complaint as if set forth *verbatim*.

154. Defendant unreasonably delayed the evaluation of Plaintiff's request for benefits, in violation of C.R.S. §§ 10-3-1115 and 10-3-1116, in various ways as set forth above, including, *but not limited to*:

   a. repeatedly stalling and requesting medical records it already had in its possession;
   b. requesting medical records over the course of several months instead of requesting all relevant medical records at one time;
   c. continuing to refuse to tender the full $500,000.00 in benefits that Defendant assured Plaintiff existed;
   d. stating that it could not respond to Plaintiff's request for UM Benefits because one of its "managers is on a fishing trip";
   e. hiring medical counsel to review Plaintiff's medical records without informing Plaintiff that it was doing so, and then failing to inform Plaintiff that Defendant's retention of medical counsel would further delay its evaluation of Plaintiff's claim by many weeks; and,
   f. taking more than six months after it first received Plaintiff's request for UM benefits to make a final offer of settlement.

155. Despite the fact the physician who Defendant hired to perform an Independent Medical Record Review confirmed that all of Plaintiff's treatment was related to the crash, reasonable, and caused by the crash, Defendant ultimately offered Plaintiff zero dollars for any of her pain and suffering or physical impairment that she was entitled to under the law. Thus, because of this and other reasons, Defendant unreasonably denied Plaintiff's claim for benefits in violation of C.R.S. §§ 10-3-1115 and 10-3-1116 when it denied and failed to settle Plaintiff's claims for benefits by refusing to tender the full $500,000.00 in UM Benefits that Defendant assured Plaintiff existed.

14

156.    Pursuant to C.R.S. § 10-3-1116, Plaintiff is entitled to recover the covered benefit plus twice the covered benefit as well as attorney fees and costs from Defendant for the unreasonable delay and denial of her claim for uninsured motorist benefits.

## FOURTH CLAIM FOR RELIEF
### Bad Faith

157.    Plaintiff incorporates herein by this reference the allegations contained in Paragraphs 1 through 156 of this Complaint as if set forth *verbatim*.

158.    Defendant owed Plaintiff a duty of good faith and fair dealing.

159.    Defendant's actions as set forth above amounted to bad faith and unreasonable conduct under Colorado law and Defendant knew its actions were unreasonable and/or recklessly disregarded the fact that its actions were unreasonable.

160.    Defendant breached its duty of good faith and fair dealing, its covenant to act in good faith with regard to Plaintiff, and acted unreasonably in, as stated above, the following ways, including, *but not limited to*:

    a.  taking an adversarial position to its insured;

    b.  at the time it believed there was $500,000.00 in coverage, only offering $283,000.00 in benefits;

    c.  implicitly accusing its own insured of hiding medical records;

    d.  repeatedly re-requesting records Defendant already had in its possession;

    e.  spreading its requests for various requests for medical records over several months instead of making a single, prompt request for all relevant medical records;

    f.  looking for myriad ways to avoid paying its insured the $500,000.00 in UM Benefits that Defendant assured Plaintiff existed for over eighteen months (such as looking vigorously in her own medical records for any reason not to pay, minimizing her pain and suffering, and discounting the surgical recommendation of her treating surgeon for a lumbar fusion);

    g.  changing its own coverage determination, to its own benefit, eighteen months after repeatedly telling Plaintiff there was $500,000.00 in coverage;

    h.  retaining numerous attorneys and coverage counsel to find justification for changing its coverage analysis;

    i.  waiting until after Plaintiff had incurred hundreds of thousands of dollars in personal debt related to additional medical treatment before changing its coverage analysis;

    j.  sending Plaintiff and Plaintiff's attorneys a check and settlement release before Plaintiff had even agreed to accept a settlement from Defendant or sign a release;

    k.  admitting that it had made "an error" and "a mistake" but failing to take any substantive responsibility for the error in its coverage analysis, such as standing by its initial determination; and

    l.  attempting to relate Plaintiff's injuries as a result of the crash to prior incidents or pre-existing injuries without any specificity to what those prior incidents or injuries might be.

15

161.    As a direct and proximate result of Defendant's unreasonable actions, Plaintiff has suffered and will continue to suffer economic and non-economic damages as described above.

WHEREFORE, the Plaintiff, Kimberly Schock, prays for judgment against Defendant Pharmacists Mutual Insurance Company, in an amount to be determined by the trier of fact for her losses as set forth above and for costs, expert witness fees, filing fees, pre- and post-judgment interest, and such other further relief as the Court deem appropriate, just, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. Pro. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: March 6, 2017

Respectfully submitted,

ZANER HARDEN LAW, LLP

_/S/ Kurt Zaner_
Kurt Zaner, Esq. #40989
Elliot Singer, Esq. #47490
1610 Wynkoop Street, Suite 120
Denver, CO 80202
Phone: (303) 563-5354
Fax:    (303) 563-5351
E-mail: kz@zanerhardenlaw.com
        es@zanerhardenlaw.com

Plaintiff's Address:

11485 West Kentucky Drive
Lakewood, Colorado 80226

16



# NAMICO®

(A Stock Insurance Company, Hereafter Called the "Insurer".)

**NAMIC Insurance Company, Inc.**
3601 Vincennes Road | P O Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC | Fax (317) 872-5636 | www.namicinsurance.com

## INSURANCE COMPANY PROFESSIONAL LIABILITY INSURANCE AND
## DIRECTORS AND OFFICERS LIABILITY INSURANCE
### DECLARATIONS - Continued
### THIS IS A CLAIM MADE AND REPORTED POLICY - PLEASE READ IT CAREFULLY

**1. NAMED INSURED** (Address, City, State, Zip):

Pharmacists Mutual Insurance Company
808 Highway 18 W
Algona, IA 50511
Insured Number: 000921

**2. POLICY PERIOD:**

FROM 9/30/2015 TO 9/30/2016 12:01 A.M.
Standard Time at Address Stated in Item 1.
Policy Number:    C01330015
RENEWAL POLICY: C01278714

---

**10. POLICY AND ENDORSEMENTS ATTACHED AT INCEPTION (Continued):**

9 NIC-EAC-754 (07/14)    10 NIC-EAP-772 (02-15)    11 NIC-E-29 (5/00)    12 NIC-EAC-759 (07/14)

13 NIC-EAC-760 (07/14)    14 NIC-EAC-745 (07/14)    15 NIC-EAC-765 (07/14)    16 NIC-EAC-766 (07/14)

17 NIC-E-40-IA (3-11)    18 NIC-E-COVPG (01/15)

These declarations, the completed signed Application with
submissions, Policy and Endorsements shall constitute the
contract between the Insurer and the Insured.
**Policy Issuance Date:** 10/6/2015
**Print Date:** 10/6/2015
COMB-D (5-13)

**Page:** 2 of 2

EXHIBIT
tabbies
2



NAMIC Insurance Company, Inc.
3601 Vincennes Road | P O Box 69700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC | Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer".)

In Witness Whereof, the Company has caused this policy to be executed and attested.

**Secretary**

**President**

The information contained herein replaces any similar information contained elsewhere in the policy

NIC-E-COVPG(1-15)



**NAMIC Insurance Company, Inc.**
3601 Vincennes Road | P. O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC   Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company Hereafter Called the "Insurer")

## INSURANCE COMPANY COMBINED PROFESSIONAL LIABILITY AND DIRECTORS & OFFICERS LIABILITY INSURANCE

**NOTICE: THIS IS A CLAIMS MADE AND REPORTED POLICY. THE COVERAGE OF THIS POLICY IS LIMITED TO CLAIMS THAT ARE FIRST MADE AGAINST IN-SUREDS AND REPORTED IN WRITING BY AN INSURED TO THE INSURER DUR-ING THE POLICY PERIOD OR APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY LOSS SHALL BE REDUCED BY AMOUNTS INCURRED AS CLAIM EXPENSE. FURTHER NOTE THAT THE DE-DUCTIBLE SHALL BE APPLICABLE TO AMOUNTS INCURRED AS CLAIM EXPENSE.**

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to NAMIC Insurance Company, Inc. (hereinafter called the Insurer) including all statements and representations made in the application form and its attachments and the material incorporated therein and made a part hereof, the Insurer agrees as follows:

## I.  INSURING AGREEMENTS

### A.  Insurance Company Professional Liability

The Insurer will pay on behalf of an **INSURED** all **LOSS** resulting from a **CLAIM** first made against an **INSURED** and reported in writing by an **INSURED** to the Insurer during the **POLICY PERIOD** or applicable Extended Reporting Period, alleging an act, error or omission in the performance of **PROFESSIONAL SER-VICES** on or after the **PRIOR ACTS DATE.** A **CLAIM** must be brought in the United States of America, its possessions or territories, Puerto Rico or Canada.

### B.  Directors & Officers Liability

The Insurer will pay on behalf of an **INSURED** all **LOSS** resulting from a **CLAIM** first made against an **INSURED** and reported in writing by an **INSURED** to the Insurer during the **POLICY PERIOD** or applicable Extended Reporting Period, alleging any **WRONGFUL ACT** of a **DIRECTOR OR OFFICER** of an **INSURED ENTITY,** committed solely in their individual or collective capacities as such, on or after the **PRIOR ACTS DATE.** A **CLAIM** must be brought in the United States of America, its possessions or territories, Puerto Rico or Canada.

### C.  Investigation, Defense and Settlement

The Insurer shall have the right and duty to defend any **CLAIM** first made against an **INSURED** and reported in writing by an **INSURED** to the Insurer during the **POLICY PERIOD,** or applicable Extended Reporting Period, alleging a **WRONGFUL ACT** or acts, errors or omissions in the performance of **PROFES-SIONAL SERVICES** on or after the **PRIOR ACTS DATE,** and seeking **LOSS** payable under the terms of this policy, even if such allegations are groundless, false or fraudulent. The Insurer shall have the right to choose counsel to defend an **INSURED.** The Insurer may make any investigation it deems necessary and reasonable, and may, with the written consent of the **INSURED,** make any set-tlement of any **CLAIM** it deems expedient.

If an **INSURED** shall refuse to consent to any settlement or compromise recom-mended by the Insurer and acceptable to the claimant and shall elect to further contest the **CLAIM,** then the Insurer's liability shall not exceed the amount for

which the Insurer would have been liable for **LOSS** and **CLAIM EXPENSE** at the time the **CLAIM** could have been settled or compromised. Should the **INSURED** refuse consent for such recommended settlement, the Insurer may withdraw from the defense of the **CLAIM.**

If an **INSURED** shall refuse such consent and continue to contest the **CLAIM** and either prevail in litigation or settle for an amount less than the **LOSS** amount which the Insurer recommended, the Insurer shall, subject to the deductible and any applicable policy provision, reimburse the **INSURED** for **LOSS** and/or **CLAIM EXPENSES** incurred by the **INSURED** subsequent to the proposed settlement, even if the **CLAIM EXPENSE** to be reimbursed to **INSURED** exceeds the **CLAIM EXPENSE** at the time of the proposed settlement, but in no event shall the Insurer be obligated to reimburse the **INSURED** for more than the total amount of **CLAIM EXPENSE** and **LOSS** at the time of the proposed settlement recommended by the Insurer.

The Insurer has the right, but not duty, to appeal any judgment.

Except at the **INSURED'S** own cost and for the **INSURED'S** own account, an **INSURED** will not, without the Insurer's prior written consent:

1. Make any payment;

2. Admit any liability;

3. Settle any **CLAIM;**

4. Assume any obligation;

5. Incur any expense; or

6. Enter into any agreement as to Items **1.-5.,** above.

**The Insurer is not obligated to pay any LOSS or incur CLAIM EXPENSE for any CLAIM after the applicable Limit of Liability has been exhausted by payment of LOSS and/or CLAIM EXPENSE.**

D. **Supplemental Coverage**

The Insurer will pay up to a total of $25,000 per **POLICY PERIOD** under each Supplemental Coverage for all events under that Supplemental Coverage during the **POLICY PERIOD.** This Supplemental Coverage amount is part of and not in addition to the Limit of Liability stated in the Declarations. No Deductible will apply to the Supplemental Coverage payment.

1. **Catastrophe Extra Expense:** The Insurer will reimburse the **NAMED IN-SURED** for actual extra expenses incurred by the **NAMED INSURED** as a result of a catastrophe during the **POLICY PERIOD** beginning on the date of the catastrophe and continuing for thirty (30) days thereafter. The extra expense incurred must be incurred by the **NAMED INSURED** only to assist in the insurance claims processing needs of the **NAMED INSURED'S** customers who have been affected by the catastrophe. The catastrophe must be declared a catastrophe by Insurance Service Office's Property Claims Services, or by the Governor of the state in which the customers are located. All such expenses incurred as a result of all catastrophes declared for thirty (30) days following the first declared catastrophe will be considered as one reimbursable event.

2. **Liability for Release of Protected Information:** The Insurer will defend and indemnify an **INSURED** with regard to allegations of acts, errors or omissions in the performance of **PROFESSIONAL SERVICES**, or a **WRONGFUL ACT**, arising from an **INSURED'S** civil liability for misappropriation, theft or negligence in the handling of a claimant's financial or health history information. This coverage does not pay **LOSS** or **CLAIM EXPENSE** for the costs of compliance with non-monetary damage orders, judgments or settlements; or for fines or penalties prescribed by statute or regulation as a result of an order, judgment or settlement imposed on an **INSURED** by a regulatory or judicial entity, or for **LOSS** or **CLAIM EXPENSE** incurred as a result of a criminal prosecution arising from such misappropriation, theft or negligent handling of information. This coverage shall not extend to an **INSURED** who knowingly, willfully or with reckless disregard, misappropriates or commits theft of, or conspires to misappropriate or commit theft of, such information.

3. **Hearings before administrative bodies for employment discrimination.** The Insurer shall defend an **INSURED** before an administrative agency or hearing officer from allegations of violations of federal, state or local laws relating to discrimination in employment. The Insurer shall have the right to select and retain defense counsel. This provision shall not include coverage for indemnification, including but not limited to lost wages (past or future), attorney fees awarded to a claimant, the costs of benefits ordered provided (past, present or future), or any fines or penalties imposed on an **INSURED** by the regulatory or administrative agency.

4. The Insurer will reimburse an **INSURED ENTITY** for actual extra expenses incurred by the **INSURED ENTITY** as a result of a **DATA PROCESSING** failure caused by the acts, errors or omissions of a **DATA PROCESSING** vendor that is not an **INSURED.** The extra expense must be incurred by the **INSURED ENTITY** only to assist in the **DATA PROCESSING** needs of the **INSURED ENTITY.**

All such expenses incurred as a result of all **DATA PROCESSING** failures declared for thirty (30) days following the first claimed failure will be considered as one reimbursable event.

E. **Reimbursement and Indemnification**

As to a **CLAIM** first made during the **POLICY PERIOD** and reported in writing by an **INSURED** to the Insurer during the **POLICY PERIOD** or applicable Extended Reporting Period alleging any **WRONGFUL ACT** of a **DIRECTOR OR OFFICER** of an **INSURED**, committed solely in their individual or collective capacities as such, on or after the **PRIOR ACTS DATE,** the Insurer shall:

1. reimburse an **INSURED ENTITY** for **LOSS** or **CLAIM EXPENSE** paid as indemnification to a **DIRECTOR OR OFFICER** as a result of a **CLAIM** alleging **WRONGFUL ACTS** against the **DIRECTOR OR OFFICER** of the respective **INSURED ENTITY** in their capacity as such and not otherwise covered by the terms and conditions of this policy, if the **INSURED ENTITY** is obligated to make such payment under the indemnification provisions of the corporate By-laws or Articles of Incorporation, or by the law of the state in which the **INSURED ENTITY** is incorporated.

2. indemnify a **DIRECTOR OR OFFICER** of an **INSURED ENTITY** if the **INSURED ENTITY** fails or refuses, other than due to **FINANCIAL IMPAIRMENT,** to indemnify a **DIRECTOR OR OFFICER** for **LOSS** or **CLAIM**

**EXPENSE** not otherwise covered by this policy, to the fullest extent as permitted or required under the Bylaws or Articles of Incorporation of the **INSURED ENTITY**, or controlling state law of the domicile state of the **INSURED ENTITY**. As to such indemnified amounts, the deductible amount stated in Item **4.** of the Declarations shall be waived in its entirety. In the event of payment under this provision, the Insurer shall have the right to seek reimbursement from the **INSURED ENTITY** of such amounts paid by the **INSURER**.

## II. DEFINITIONS

For the purpose of these Definitions, the singular of a defined term includes the plural and the plural includes the singular.

### A. ADVERTISING INJURY shall mean:

1. copyright infringement or patent infringement;
2. misappropriation or infringement of trademark, service mark or trade dress;
3. misappropriation or infringement or misuse of trade secrets;
4. unfair competition;
5. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or
6. oral or written publication or dissemination of material that violates a person's right of privacy (except as provided under **Insuring Agreement D.2.,** above);

arising out of an allegation of an act, error or omission in the performance of **PROFESSIONAL SERVICES** or an allegation of a **WRONGFUL ACT.**

### B. AGENCY/BROKERAGE SERVICES shall mean the following insurance-related services performed for others by an **INSURED**:

1. Processing of applications and renewals;
2. Claim handling;
3. Inspection and loss control;
4. Insurance consulting;
5. Sales or marketing of insurance products;
6. Risk management, loss control and/or anti-fraud services;
7. Premium financing;
8. **NOTARY PUBLIC SERIVCES;**
9. Surplus lines insurance placement;
10. Duties of a Managing General Agency; or
11. **INSURANCE EDUCATION SERVICES.**

### C. BODILY INJURY shall mean physical injury, sickness, disease, death, mental anguish or emotional distress arising from physical injury, sickness, disease or death, of any person.

### D. CLAIM shall mean:

1. As to **Insuring Agreements A., D.** and **E., CLAIM** shall mean:

    a.  a civil proceeding in a court of law seeking monetary damages;

    b.  a regulatory or administrative proceeding against an **INSURED** seeking monetary damages; or

    c.  an arbitration proceeding against an **INSURED** seeking monetary damages.

2.  As to **Insuring Agreement B.**, **CLAIM** shall mean:

    a.  a civil proceeding in a court of law;

    b.  a regulatory or administrative proceeding; or

    c.  an arbitration proceeding

    against an **INSURED** seeking monetary damages, injunctive relief or non-monetary relief.

3.  Any request to toll or waive a statute of limitations.

A **CLAIM** shall be considered first made when an **INSURED** receives written notice of the **CLAIM** from a claimant or a claimant's legal representative or agent, or on the date the **INSURED** is served with legal service of process of any such suit or notice from a regulatory authority, whichever first occurs.

E.  **CLAIM EXPENSE** shall mean the necessary and reasonable costs, expenses and fees incurred in the investigation, adjustment, defense and/or appeal of any **CLAIM**, subject to the Insurer's right and duty to defend as set forth in Section I. **Insuring Agreements**, Paragraph C.

**CLAIM EXPENSE** shall not include:

1.  overhead or any regular or overtime wages owed to or incurred by an **INSURED**;

2.  salaries, fees or benefits of any **INSURED**;

3.  prejudgment or post-judgment interest on any portion of a verdict for damages or judgment; or

4.  **LOSS.**

**CLAIM EXPENSE** includes reimbursement to an **INSURED** for reasonable expenses incurred by the **INSURED** to attend depositions or trials at the request of the Insurer. This coverage is limited to $250.00 per day, and subject to a maximum of $5,000.00 in the aggregate for all such attending **INSUREDS** per **CLAIM.**

**CLAIM EXPENSE** includes premiums for bonds to release attachments or appeal bond premiums, limited to that portion of the bond which does not exceed the policy's Limit of Liability. The Insurer is not required to secure such bonds, and does not furnish such bonds.

F.  **CONTINUITY DATE** shall mean the date shown in the Declarations. This date is the effective date of the last policy for which the **NAMED INSURED** provided a warranty statement in conjunction with an application for insurance coverage similar to the coverage afforded by **Insuring Agreements A.** (excepting coverage for **EMPLOYED AGENT ACTIVITIES**), **B.** or **E.,** or the effective date of the first policy providing similar coverages written for the **NAMED INSURED** under the **NAMIC PROFESSIONAL LIABILITY INSURANCE PROGRAM**, and from which date the **NAMED INSURED** has maintained continuous and uninterrupted

similar coverage. The warranty statement must relate to acts, errors or omissions in the performance of **PROFESSIONAL SERVICES** or **WRONGFUL ACTS** which an **INSURED** knew or reasonably should have known could result in a **CLAIM** against such coverage.

The Insurer and **INSUREDS** agree said warranty statement, in conjunction with the application, if applicable, executed by the **NAMED INSURED** or on behalf of the **NAMED INSURED** by an officer of the **NAMED INSURED** authorized to make such a statement:

1. has been deemed acceptable by the Insurer;

2. shall be retained by the Insurer and deemed incorporated into and attached to this policy;

3. contains particulars and statements that are true and accurate statements; and

4. contains factual representations that are deemed material to the decision by the Insurer to issue this policy and this policy is issued in reliance upon those representations and warranties.

G. **DATA PROCESSING** shall mean:

1. the entry of data into an electronic medium;

2. the transfer of electronically stored information from one data source or type to another, or the transfer of electronically stored information from one storage device or hard drive to another, for the purpose of storage, manipulation, calculation or reporting of such data;

3. the preparation of policy forms and endorsements by means of a computer and software;

4. issuance of checks by means of a computer and software; or

5. design or preparation of reports regarding the operations or financial status of a customer by means of a computer and software.

**DATA PROCESSING** shall not include:

a. software development, programming or coding;

b. the correction of programming errors or defects that cause corruption or errors in data;

c. the correction of errors in data;

d. marketing, sales or evaluation of any software or hardware package;

e. participation in a "users group" for any software program; or

f. **DATA PROCESSING** for any **INSURED ENTITY**.

H. **DIRECTOR OR OFFICER** shall mean all past, present and future duly elected or appointed directors or officers of an **INSURED ENTITY**. Officer shall also include a natural person appointed as the manager of an **INSURED ENTITY** by the Board of Directors, even if such employee is not a **DIRECTOR OR OFFICER** of the **INSURED ENTITY**.

I. **EMPLOYED AGENT ACTIVITIES** shall mean those **AGENCY/BROKERAGE SERVICES** rendered by an employee of an **INSURED ENTITY** solely as to:

1. insurance contracts and endorsements issued by the **INSURED ENTITY** to its policyholders; or

2. insurance contracts or endorsements issued by an **INSURED ENTITY** and another insurance carrier as part of a "package policy,"

provided that the employee does not have individual appointment contracts with such other insurance carriers, and that the employee receives only a W-2 from an **INSURED ENTITY** as to any compensation arising from such **EMPLOYED AGENT ACTIVITIES.**

J. **FINANCIAL IMPAIRMENT** shall mean the status of the **INSURED ENTITY** resulting from:

1. the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **INSURED ENTITY**; or

2. the **INSURED ENTITY** becoming a debtor in possession.

K. **INSURANCE EDUCATION SERVICES** shall mean an **INSURED** teaching a formal insurance course or seminar, whether for compensation or not.

L. 1. **INSURED** shall mean:

   a. an **INSURED ENTITY**;

   b. any natural person named by endorsement;

   c. any past, present or future **DIRECTOR OR OFFICER** of an **INSURED ENTITY** but only while such person is acting in such capacity within the scope of his/her duties; or

   d. the estates, heirs, legal representatives or assigns of deceased persons who were an **INSURED** at the time the alleged act, error or omission committed in the performance of **PROFESSIONAL SERVICES** or **WRONGFUL ACT** on which the **CLAIM** is based, but only while such person is acting in such capacity within the scope of his/her duties as well as the legal representatives or assigns of such **INSURED** in the event of their incompetency, insolvency or bankruptcy.

2. As to **Insuring Agreements A., C.** and **D., INSURED** shall also mean any past, present or future employee of an **INSURED ENTITY** but only while acting in such capacity within the scope of his/her duties.

3. As to **Insuring Agreements B., C.** and **E., INSURED** shall also mean any employee of an **INSURED ENTITY** whose employment duties involve the preparation of financial reports or filings submitted to a regulatory authority, rating bureau or association of regulatory authorities, but only for the purposes of a **CLAIM** alleging a **WRONGFUL ACT** relating to the negligent preparation or filing of such reports, and only while such person is acting in such capacity within the scope of his or her duties.

4. As to **Insuring Agreements B., C.** and **E., INSURED** shall also mean any employee of an **INSURED ENTITY** whose employment duties include the completion or filing with any regulatory authority or employee benefits provider of forms or reports relating to wages, salaries or other compensation, or relating to employee benefits such as pensions or health insurance, but only for the purposes of a **CLAIM** alleging **WRONGFUL ACTS** in the completion

or filing of such reports or forms, and only while such person is acting in such capacity within the scope of his or her duties. This coverage shall not apply if such **CLAIM** is covered by any other policy, including but not limited to an Employee Benefit Liability provision or endorsement of any other policy, Trustee & Fiduciary Liability policy, Business Owners Package policy or Commercial Liability policy.

M. **INSURED ENTITY** shall mean:

1. a sole proprietorship, partnership, limited liability partnership, professional partnership, corporation or limited liability corporation named by endorsement to this policy;

2. the **NAMED INSURED;** or

3. a **SUBSIDIARY.**

N. **LOSS** shall mean a monetary judgment, award or settlement arising from a covered **CLAIM** which an **INSURED** is legally obligated to pay. **LOSS** shall also include payments for Supplemental Coverages under **Insuring Agreement D.**

**LOSS** shall include interest only on that part of any judgment which does not exceed the Limit of Liability, which accrues after the entry of the judgment and before the Insurer has paid, offered to pay or deposited in court that part of the judgment that does not exceed the Insurer's Limit of Liability or remaining Limit of Liability if diminished by payment of **LOSS** and/or **CLAIM EXPENSE** relating to other **CLAIMS.** Such interest payment shall be part of and not in addition to the Limits of Liability shown on the Declarations.

**LOSS** shall include punitive damages, exemplary damages or any damages which are a multiple of compensatory damages awarded against the **INSURED,** including double or treble damages, if such damages are deemed insurable under the law by which this policy is construed. Punitive damages, exemplary damages or any damages which are a multiple of compensatory damages awarded against the **INSURED,** including double or treble damages, which arise out of an allegation or cause of action not covered by this policy, or excluded from coverage under this policy, shall not be payable as **LOSS.**

For the purpose of determining whether punitive, exemplary or multiplied damages are payable as **LOSS,** the law most favorable to the insurability of such damages of either the domicile state of the **NAMED INSURED** or the jurisdiction whose substantive law is deemed to control the **CLAIM** shall apply.

**LOSS** shall not include:

1. taxes, civil or criminal fines, sanctions, restitution or penalties, whether pursuant to any civil or criminal law or statute;

2. amounts paid to the **INSURED** as fees, costs or expenses for services performed which are to be reimbursed or discharged as part of the judgment or settlement;

3. **CLAIM EXPENSE;**

4. any cost assessed against the **INSURED** as the result of a regulatory proceeding;

5. equitable relief, injunctive relief, declaratory relief or any other relief or recovery that is not seeking monetary judgment, award or settlement;

6. any fees, costs or expenses, including but not limited to claimant/plaintiff attorney fees, related to or arising from an **INSURED** complying with equitable relief, injunctive relief, declaratory relief or any other relief or recovery agreed to by or ordered against an **INSURED;**

7. costs of complying with physical modifications to an **INSURED'S** premises or any changes to an **INSURED'S** usual business operations mandated by the Americans with Disabilities Act of 1990 including any amendments or similar federal, state or local law;

8. salaries, regular or overtime wages, commissions, overhead, fees or benefits owed to or incurred by any **INSURED;** or

9. dividends or other distributions of corporate profits or surplus.

O. **NAMED INSURED** shall mean the organization stated in Item **1.** of the Declarations.

P. **NAMIC PROFESSIONAL LIABILITY INSURANCE PROGRAM** shall mean the program of insurance company professional liability insurance and related insurance products sold by NAMIC Insurance Agency Inc. and underwritten and/or reinsured by NAMIC Insurance Company, Inc. (NAMICO) and its business partners, including Insurer, to members of the National Association of Mutual Insurance Companies (NAMIC) and agents appointed by NAMIC member companies.

Q. **NOTARY PUBLIC SERVICES** shall mean services rendered as a duly appointed Notary Public in the course and scope of the **INSURED'S** capacity as an employee, and shall be limited to **CLAIMS** in which the alleged act, error or omission resulted from notary services rendered in the presence of the person whose signature was notarized.

R. **OUTSIDE ENTITY** shall mean any non-profit corporation, fund or foundation (other than the **NAMED INSURED**) that is exempt from federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986 (as amended), or any other corporation or organization that is listed by endorsement to this policy.

S. **PENDING OR PRIOR LITIGATION DATE** shall mean the date shown in the Declarations. Coverage shall not apply to any **CLAIM** arising from any litigation pending or filed before the **PENDING OR PRIOR LITIGATION DATE** or derived from the same or essentially the same facts (actual or alleged) that gave rise to litigation pending or filed prior to the **PENDING OR PRIOR LITIGATION DATE.** A **PENDING OR PRIOR LITIGATION DATE** of "NONE" indicates no **PENDING OR PRIOR LITIGATION DATE** applies.

T. **PERSONAL INJURY** shall mean false arrest, false imprisonment, malicious prosecution, malicious use or abuse of process, assault, battery, loss of consortium, injury from oral or written publication of a libel or slander or of other disparaging material, or written or oral publication or dissemination of material that violates a person's right of privacy, or wrongful eviction or wrongful entry or wrongful invasion of any right of private occupancy (except as provided under **Insuring Agreement D.2.**).

U. **POLICY PERIOD** shall mean the period stated in the Declarations or any shorter period resulting from policy cancellation. If this period is less than or greater than one year, then the Limits of Liability specified in the Declarations shall be the Insurer's maximum Limit of Liability under this policy for the entire period.

V. **POLLUTANTS** shall mean any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by, the United States Environmental Protection Agency or a state, county, municipality or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. Pollutants shall also mean any other air emission, odor, wastewater, oil or oil products, infectious or medical waste, asbestos or asbestos products and any noise.

W. **PRIOR ACTS DATE** shall mean the date shown in the Declarations. Coverage shall not apply to any **CLAIM** arising from any acts, errors or omissions before the **PRIOR ACTS DATE**. A **PRIOR ACTS DATE** of "FULL" indicates there is no time limitation with respect to prior acts, errors or omissions of an **INSURED**.

X. **PROFESSIONAL SERVICES** shall mean the following services performed by the **INSUREDS**:

1. Underwriting;

2. Claim Handling and Adjusting;

3. Safety Engineering, Safety Inspection and Loss Control Operations;

4. Insurance Consulting;

5. Personal Injury Rehabilitation;

6. Subrogation and Salvage Operations;

7. Premium Financing;

8. Business Development and Marketing of insurance products;

9. **DATA PROCESSING;**

10. Risk Management;

11. **EMPLOYED AGENT ACTIVITIES;**

12. **TERMINATION OF AGENCY RELATIONSHIP;**

13. **INSURANCE EDUCATION SERVICES;** or

14. **NOTARY PUBLIC SERVICES.**

**PROFESSIONAL SERVICES** do not include any actual or alleged **WRONGFUL ACT** of an **INSURED**.

Y. **PROPERTY DAMAGE** shall mean damage to or destruction of any tangible real or personal property, including the loss of use thereof. Real or personal property shall not include data stored on any computer storage device or hardware, either located on the premises of an **INSURED** or otherwise.

Z. **SUBSIDIARY** shall mean any organizations in which the **NAMED INSURED** owns or controls, directly or indirectly, more than fifty percent (50%) of the voting securities or voting rights representing the right to vote for election of directors. However, if the assets of such an organization exceed twenty-five percent (25%) of the assets of the **NAMED INSURED,** then such organization must be separately endorsed to this policy to be a **SUBSIDIARY.**

PH0031

**SUBSIDIARY** shall not include any federal or state chartered bank, savings and loan, credit union, Thrift, consumer lending entity, premium finance entity, mortgage broker, mortgage lender or insurance agency, unless added by specific endorsement.

AA. **TERMINATION OF AGENCY RELATIONSHIP** shall mean any act by an **INSURED** that terminates an agency relationship with any person or entity appointed to sell the insurance products of such **INSURED.**

BB. **WRONGFUL ACT** shall mean any actual or alleged act, error, misstatement, misleading statement, neglect, breach of duty or omission by a **DIRECTOR OR OFFICER** of an **INSURED,** or an employee of an **INSURED ENTITY** as provided in Definition **L.3.** or **L.4.** committed in their respective capacities as such. **WRONGFUL ACT** does not include any actual or alleged act, error or omission committed in the performance of **PROFESSIONAL SERVICES.**

## III. EXCLUSIONS

This policy does not apply to:

A. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to, a plea agreement determination, an alternative dispute resolution proceeding, a judgment or a final adjudication that an **INSURED** gained profit or advantage to which an **INSURED** was not legally entitled;

B. an allegation in a **CLAIM** arising from, based upon, attributable to or related in any way (directly or indirectly) to **(1) BODILY INJURY, (2) PROPERTY DAMAGE, (3) ADVERTISING INJURY** or **(4) PERSONAL INJURY,** except as provided under Section **I. Insuring Agreements, Paragraph D.2.**

As to subpart **(4)** above, this exclusion does not apply to **CLAIMS** arising from allegations of malicious prosecution, malicious use or abuse of process, or injury from oral or written publication of a libel or slander or of other disparaging material, if an **INSURED** has been denied coverage for such **CLAIM** by the **INSURED'S** business owner package liability insurance. However, this policy will provide no coverage for such **CLAIM** if an **INSURED** otherwise has coverage, either primary or excess, for such **PERSONAL INJURY CLAIM;**

C. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to the criminal, dishonest or fraudulent acts or omissions or willful violation of any statute or regulation by any **INSURED** should a judgment or final adjudication thereof establish that such criminal, fraudulent or dishonest acts or omissions or willful violations were committed with actual purpose and intent. For purposes of this exclusion, the criminal, fraudulent or dishonest acts or omissions or willful violations of an **INSURED** shall not be imputed to any other **INSURED,** except as provided in Section **IV. GENERAL CONDITIONS,** Condition **I. Severability;**

D. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to an **INSURED ENTITY'S** conversion, demutualization or similar form of reorganization, whereby the form of ownership is changed from mutual to stock form, whether or not a mutual and/or stock holding company is utilized in connection therewith;

E. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to:

    1. any acts, errors or omissions in the performance of or capacity as:

    a. an investment banker, investment underwriter, investment advisor, investment agent, trustee or promoter;

    b. selling, administering, managing or arranging viatical settlements;

    c. the sale, distribution or servicing of mutual funds, annuities, or securities of any type;

    d. providing a guarantee, opinion or belief as to the future value of an investment; or

    e. the sale, operation, creation, organization or management of a Multiple Employer Welfare Arrangement or plan (MEWA); or

  2. profits in fact made from the purchase or sale by an **INSURED** of securities of an **INSURED ENTITY** within the meaning of Section 16(b) of the Securities Exchange Act of 1934 or amendments thereto or similar provisions of any federal, state or local statutory law or common law;

F. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to **WRONGFUL ACTS** of a **DIRECTOR OR OFFICER** committed in a capacity as **DIRECTOR OR OFFICER** of any entity other than for an **INSURED ENTITY**, as defined. This exclusion shall **not** apply to any such **DIRECTORS OR OFFICERS** who serve at the specific written request of the **INSURED ENTITY** as a **DIRECTOR OR OFFICER** of any **OUTSIDE ENTITY** provided that the coverage afforded to such **DIRECTORS OR OFFICERS** by this policy shall be excess of any indemnification or insurance afforded by the **OUTSIDE ENTITY**;

G. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to an **INSURED'S** activities as an insurance agent, broker, managing general agent, insurance consultant or insurance solicitor; however this Exclusion shall not apply to **CLAIMS** arising out of or alleging **EMPLOYED AGENT ACTIVITIES**;

H. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to:

  1. warranties made in connection with safety inspection, loss control and safety engineering services;

  2. loss for premiums, return premiums, commissions or tax monies, or commingling of funds; or

  3. costs exceeding estimates made in the performance of **PROFESSIONAL SERVICES**;

I. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to any contract obligation, whether real or alleged, assumed by or imposed upon an **INSURED** arising out of:

  1. any policy or contract of insurance, reinsurance, insurance pool, suretyship, annuity or endowment; or

  2. any written contract, unless the **INSURED** would have been liable in the absence of such contract;

J. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to the financial inability or failure of an **INSURED ENTITY** to

pay or fulfill obligations under any policy or contract of insurance, reinsurance, insurance pool, suretyship, annuity or endowment; or the adequacy of any **INSURED ENTITY'S** claim reserves or other financial reserves or adequacy of re-insurance;

K. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to any act, error or omission in the performance of **PROFESSIONAL SERVICES,** or a **WRONGFUL ACT,** prior to the **CONTINUITY DATE** if any **INSURED,** as of the **CONTINUITY DATE,** knew or could have reasonably foreseen that such act, error or omission or **WRONGFUL ACT** might be the basis for a **CLAIM;**

L. any **LOSS** which is insured under any other policy or policies of insurance, except as pursuant to Section **IV. GENERAL CONDITIONS** Condition **E. Other Insurance** of this policy in respect to any excess beyond the amounts of the Limits of Liability of such other policy or policies;

M. any **CLAIM** based upon, attributable to or related in any way (directly or indirectly) to:

    1. acts, errors or omissions of any **INSURED** which are the subject of any notice given under a policy or policies of insurance prior to the effective date of this policy;

    2. any demand, suit or proceeding served on an **INSURED** or an **INSURED'S** resident agent for service of process, or demand, suit or proceeding of which an **INSURED** has actual or constructive knowledge, prior to the **PENDING OR PRIOR LITIGATION DATE,** or any order, decree or judgment entered against an **INSURED** on or prior to the **PENDING OR PRIOR LITIGATION DATE,** or the same or substantially the same fact, circumstance or situation underlying or alleged therein; or

    3. any act, error or omission prior to the **PRIOR ACTS DATE** in Item **6.** of the Declarations;

N. any **CLAIM** brought or maintained by or on behalf of any **INSURED** in any capacity except:

    1. a **CLAIM** that is a derivative action brought or maintained on behalf of an **INSURED ENTITY** by one or more persons who are not **INSUREDS** and who bring and maintain the **CLAIM** without the solicitation, assistance or active participation of an **INSURED;**

    2. a **CLAIM** brought or maintained by a former employee of an **INSURED** for the actual or alleged wrongful termination of such employee;

    3. allegations of employment discrimination as provided under **Insuring Agreement D.3.;**

    4. a **CLAIM** brought or maintained by any **INSURED** for contribution or indemnity, if the **CLAIM** directly results from another **CLAIM** covered under this policy;

    5. under **Insuring Agreement A.,** a **CLAIM** brought or maintained by an **INSURED** in such person's capacity as a policyholder of an **INSURED ENTITY;**

    6. any **CLAIM** brought by or maintained by an **INSURED** voluntarily engaged in any activity protected under any federal, state or local law protecting "whistleblowers," including but not limited to Section 806 of the Sarbanes Oxley Act of 2002; or

7. a **CLAIM** brought by a past **DIRECTOR OR OFFICER** who has not held that office for three or more years prior to the filing of the **CLAIM;**

O. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to violations of any of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 or amendments thereto and any similar provisions of any federal, state or local statutory or common law;

P. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to:

1. the actual, alleged, or threatened discharge, release, escape, seepage, migration or disposal of **POLLUTANTS** into or on real or personal property, water or the atmosphere; or

2. any direction or request that the **NAMED INSURED** or **INSUREDS** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **POLLUTANTS,** or any voluntary decision to do so;

Q. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to any **BODILY INJURY** or **PROPERTY DAMAGE** regarding asbestos including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of asbestos to any persons and in any environment, building or structure;

R. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to any **BODILY INJURY** or **PROPERTY DAMAGE** resulting from the radioactive, toxic or explosive properties of nuclear material which includes, but is not limited to, "source material," "special nuclear material" and "by product material" as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions of any federal, state or local statutory or common law;

S. any **CLAIM** based upon or arising out of, attributable to or related in any way (directly or indirectly) to the Fair Housing Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act, the Federal Truth-In-Lending Act, or any other state or federal laws and/or regulations relating thereto, including but not limited to, redlining, credit discrimination or steering; or any other act, error or omission that violates any federal, state or local statute, law or ordinance with regard to restrictions on marketing, pricing, underwriting or claim handling based on race, religion, age, national origin, gender or physical or mental impairment;

T. any **CLAIM** based upon or arising out of, attributable to or related in any way (directly or indirectly) to unsolicited faxes, unsolicited electronic mail, unsolicited telephone calls or any other unsolicited communications. This exclusion shall include actual or alleged violations of any local, state or federal law, including non-U.S. laws, any amendment to such laws or violation of any order, ruling or regulation issued pursuant to such laws that regulate such communications; or

U. any **CLAIM** based upon, arising out of, attributable to, or related in any way (directly or indirectly) to any act, error or omission in the performance of **PROFESSIONAL SERVICES** after the suspension, revocation, or non-renewal of the **INSURED'S** insurance license or charter.

The **WRONGFUL ACTS** of any **INSURED** shall not be imputed to any other **INSURED** for the purpose of determining the applicability of Exclusions **A., C.** or **F.**

## IV.  GENERAL CONDITIONS

### A.  Limit of Liability and Deductibles

Subject to the Limit of Liability, the Insurer will only be liable to pay **LOSS** or **CLAIM EXPENSE** in excess of the Deductible shown in the Declarations. Such Deductible amount is to be borne by the **INSURED** and shall remain uninsured. The Insurer's right and duty to defend shall attach, subject to the terms and conditions of this policy, at the time the **CLAIM** is reported to Insurer, without regard to any Deductible issue.

The Limit of Liability stated in the Declarations as applicable to each **CLAIM** is the Limit of the Insurer's total Liability for all **LOSS** or **CLAIM EXPENSE** in excess of the Deductible amount arising out of the same or related acts, errors, or omissions or **WRONGFUL ACTS** without regard to the number of **CLAIMS**, demands, suits, proceedings or claimants. If additional **CLAIMS** are subse-quently made against an **INSURED** which arise out of the same or related acts, errors or omissions or **WRONGFUL ACTS** as a **CLAIM** already made, all such **CLAIMS** whenever made shall be considered first made during the **POLICY PERIOD** or applicable Extended Reporting Period in which the earliest **CLAIM** arising out of such acts, errors or omissions or **WRONGFUL ACTS** was first made, and all such **CLAIMS** shall be subject to the same Limit of Liability. Each such related **CLAIM** shall be subject to a separate Deductible.

The Limit of Liability stated in the Declarations as the Aggregate Limit of Liability is the maximum Limit of Insurer's total Liability for the **POLICY PERIOD** for all **LOSS** or **CLAIM EXPENSE** in excess of the Deductible amount arising out of all **CLAIMS.**

With regard to the Basic Extended Reporting Period, or if a Supplemental Extended Reporting Period is purchased in accordance with Section **IV. GENERAL CONDITIONS, D.,** the Limit of Liability stated in the Declarations as applicable to each **CLAIM** or in the Aggregate at the time the policy is terminated is the Insurer's Limit of Liability for all **LOSS** or **CLAIM EXPENSE** in excess of the Deductible amount arising out of the same or related acts, errors or omissions or **WRONGFUL ACTS** for which **CLAIMS** are first made during the Extended Reporting Period. The Insurer's Limit of Liability in any applicable Extended Reporting Period shall be a part of, and not in addition to, the Limit of Liability under this policy.

If an **INSURED** seeks coverage for the same **CLAIM** or related **CLAIMS** under more than one policy issued to such **INSURED** by the Insurer or an affiliate of the Insurer, or any Insurer participating in the **NAMIC PROFESSIONAL LIABILITY INSURANCE PROGRAM,** the maximum applicable each **CLAIM** and Annual Aggregate Limit of Liability available under all the policies shall not exceed the highest applicable each **CLAIM** and Annual Aggregate Limit of Liability under any one policy. This provision does not apply to any policy issued by the Insurer or an affiliated Insurer specifically to apply as excess insurance over this or any other policy.

IN NO EVENT WILL INSURER'S LIABILITY FOR **LOSS** OR **CLAIM EXPENSE** UNDER THIS POLICY EVER EXCEED THE AMOUNT STATED IN THE DECLARATIONS.

### B.  Insured's Duties in Event of Claim

In the event of a **CLAIM,** it is a condition precedent to the **INSURED'S** rights under this policy that:

1. the **INSURED** shall immediately forward to the Insurer or its authorized representative written notice of any **CLAIM(S),** including every demand, notice, summons or other process received by the **INSURED** or the **INSURED'S** representative as soon as practicable but in no event shall such notice be received by the Insurer later than sixty (60) days after the expiration date of the **POLICY PERIOD,** or during the Extended Reporting Period (if applicable), as required by the **Insuring Agreements;**

2. the **INSURED** shall provide the Insurer or its authorized representative with a schedule of any other insurance which might in any way be applicable to the matter of which notice of **CLAIM** has been given and furnish copies of such policies on request;

3. the **INSURED** shall cooperate with the Insurer and, upon the Insurer's request, attend hearings and trials and assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the general conduct of suits; and

4. the **INSURED** shall **not,** except at its own cost, admit any liability, voluntarily make any payment, assume any obligation or incur expense of any kind, or enter into any agreement to do so.

As to **Insuring Agreement B.,** an **INSURED ENTITY** shall not be required to provide written notice as required by subpart **1.** until such time as its president, chief executive officer, general counsel, risk manager, chief operating officer or chief financial officer, or any person occupying a similar position without regard to title, or any **INSURED** reporting directly to such person, has knowledge of or reasonably could or should have knowledge of the **CLAIM.**

### C. Potential Claim Reporting

If during the **POLICY PERIOD** or Extended Reporting Period (if applicable) an **INSURED** becomes aware of a potential **CLAIM** regarding a specific act, error or omission in the performance of **PROFESSIONAL SERVICES** or a specific **WRONGFUL ACT** which may give rise to a subsequent actual **CLAIM** against an **INSURED,** and during the **POLICY PERIOD** or Extended Reporting Period (if applicable) gives written notice to the Insurer of such specific act, error or omission or **WRONGFUL ACT** regarding such potential **CLAIM,** then any **CLAIM** which subsequently arises out of such act, error or omission or **WRONGFUL ACT** shall, for the purposes of this policy, be treated as a **CLAIM** first made against the **INSURED** during the **POLICY PERIOD** or the Extended Reporting Period (if applicable) in which the written notice was received.

The written notice of such potential **CLAIM** to the Insurer shall contain the following information:

1. The specific act, error, misstatement, misleading statement, neglect, breach of duty or omission by a **DIRECTOR OR OFFICER** of any **INSURED** while committed solely in their respective capacities as such;

2. The specific act, error, or omission in the performance of **PROFESSIONAL SERVICES** or **WRONGFUL ACT;**

3. The date(s) of such conduct;

4. The injury or damage which has or may result from such conduct;

5. The identity(ies) of the **INSURED(S)** who may be the subject of the **CLAIM;**

6. The identity(ies) of any potential claimants(s); and

PH0037

7. The circumstances by which the **INSURED** first became aware of the potential **CLAIM.**

## D. Extended Reporting Period Endorsement Option

An extended reporting period endorsement allows an **INSURED** to report **CLAIMS** arising out of acts, errors or omissions in the performance of **PROFESSIONAL SERVICES** or **WRONGFUL ACTS** which occurred prior to the expiration date of the policy. It does not extend the policy term or provide coverage for acts, errors or omissions in the performance of **PROFESSIONAL SERVICES** or **WRONGFUL ACTS** after the policy expiration date. An Extended Reporting Period endorsement may be purchased only by the **NAMED INSURED** subject to the following conditions:

1. An Extended Reporting Period, either Basic or Supplemental, does not extend the **POLICY PERIOD,** change the scope of coverage provided, or increase or reinstate the Limits of Liability. Subject to the policy's terms, Limit of Liability, Exclusions and Conditions, the policy is extended to apply to **CLAIMS** first made against an **INSURED** and reported in writing by an **INSURED** to the Insurer during the Basic Extended Reporting Period or, if purchased, the Supplemental Extended Reporting Period, but only for **CLAIMS** which allege acts, errors or omissions in the performance of **PROFESSIONAL SERVICES** or **WRONGFUL ACTS** on or after the **PRIOR ACTS DATE** and on or before the expiration of the **POLICY PERIOD.**

2. A Basic Extended Reporting Period is automatically provided without additional charge. This period begins at the earliest of end of the **POLICY PERIOD** or at any earlier policy cancellation date other than a cancellation by Insurer due to non-payment of premium, and lasts for sixty (60) days. The Basic Extended Reporting Period does not apply to **CLAIMS** covered under any subsequent policy.

3. The **NAMED INSURED** may elect to purchase one of the Supplemental Extended Reporting Periods described below if the policy is non-renewed by either the **NAMED INSURED** or the Insurer, or cancelled by the **NAMED INSURED;** an Extended Reporting Period endorsement may not be purchased if the policy has been cancelled by the Insurer due to non-payment of premium.

4. The Supplemental Extended Reporting Period may be purchased if the **NAMED INSURED** is in compliance with the terms and conditions of this policy, for a period of twelve (12) months for a premium equal to one hundred percent (100%) of the annualized premium for the policy. Supplemental Extended Reporting Periods for other lengths of time may be available at rates according to the Insurer's underwriting guidelines in force at the policy Effective Date.

5. Coverage for a Supplemental Extended Reporting Period must be added by endorsement for which an additional premium charge must be paid. Such period starts sixty (60) days after the end of the **POLICY PERIOD.**

6. The right to purchase a Supplemental Extended Reporting Period Endorsement terminates unless:

   a. the Insurer receives a written request from the **NAMED INSURED** for a Supplemental Extended Reporting Period Endorsement within sixty (60) days of the end of the **POLICY PERIOD;** and

**b.** the additional premium is paid within sixty (60) days of the end of the **POLICY PERIOD.**

The **NAMED INSURED'S** request must specify the length of the Supplemental Extended Reporting Period desired. Once in effect, Extended Reporting Period Endorsements may not be canceled. The premium for a Supplemental Extended Reporting Period Endorsement is fully earned and non-refundable as of the effective date of the endorsement.

**7. CLAIMS** first made and reported during the Basic Extended Reporting Period, or the Supplemental Extended Reporting Period if purchased, will be deemed to have been made on the last day of the **POLICY PERIOD.**

### E. Other Insurance

The insurance provided by this policy shall be excess over the limits of liability of any other valid and collectible insurance available to the **INSUREDS,** whether such other insurance is stated to be primary, excess, contributing, contingent or otherwise, unless such other insurance specifically applies as excess insurance over the Limit of Liability provided by this policy. For purposes of this Section, "any other insurance" shall not include reinsurance to the extent such reinsurance provides coverage for extra-contractual damages and judgments in excess of policy limits.

### F. Spousal Liability

If a **CLAIM** against an **INSURED** includes a **CLAIM** against the **INSURED'S** lawful spouse solely by reason of **(1)** such spouse's status as spouse of the **INSURED,** or **(2)** such spouse's ownership interest in property which the claimant seeks as recovery for damages, all **LOSS** which such spouse becomes legally obligated to pay by reason of such **CLAIM** shall be treated for purposes of the policy as **LOSS** which the **INSURED** becomes legally obligated to pay on account of the **CLAIM** made against the **INSURED.** Such spousal **LOSS** shall be covered under this policy only if and to the extent such **LOSS** would be covered if incurred by the **INSURED.**

The coverage afforded by this provision does not apply to any **CLAIM** alleging any act, error or omission in the performance of **PROFESSIONAL SERVICES** or **WRONGFUL ACT** by the **INSURED'S** spouse.

Spouse shall include:

1. A person to whom an **INSURED** is married pursuant to the law of the state in which the **INSURED ENTITY** directly employing the **INSURED** is domiciled or the state in which the **INSURED** resides; or

2. A registered domestic partner or partner in a civil union, where permitted by the law of the state in which the **INSURED ENTITY** directly employing the **INSURED** is domiciled or the state in which the **INSURED** resides.

### G. Changes in Control

This policy is issued and the premium computed on the basis of the information submitted to the Insurer as part of the signed, written application and any materials submitted therewith. If any of the following events occurs during the **POLICY PERIOD:**

1. an **INSURED ENTITY** merges into or consolidates with another organization;

2. an **INSURED ENTITY** enters any agreement or contract providing for the ceding of operational control of the **INSURED ENTITY,** or for any person or persons other than an **INSURED ENTITY** to appoint new officers or new management or appoint a new Board of Directors for the **INSURED ENTITY,** or otherwise to assume or take control of the management and/or operation of the **INSURED ENTITY;**

3. an **INSURED ENTITY** changes its legal form of business organization;

4. an **INSURED ENTITY** converts from a mutual to stock form of ownership, including but not limited to the formation of a holding company incidental thereto;

5. any organization or person, or group of organizations and/or persons acting in concert, acquires securities or other voting rights which results in voting control by such other organization(s) or person(s) of more than fifty percent (50%) of the outstanding securities or present voting rights for the election of directors of an **INSURED ENTITY;** or

6. the entry of an order of insolvency, receivership, liquidation or supervision (whether voluntary or involuntary) by an authority of any state having jurisdiction over any **INSURED ENTITY,** or a bankruptcy petition being filed by any **INSURED ENTITY** or by the creditors of any **INSURED ENTITY,** or by the appointment of a Trustee or Receiver for any **INSURED ENTITY;**

coverage shall continue until termination of this policy, but only with respect to **CLAIM(S)** for acts, errors or omissions in the performance of **PROFESSIONAL SERVICES,** or **WRONGFUL ACTS,** committed by or on behalf of the **INSURED ENTITY** prior to such event. The **NAMED INSURED** shall immediately give the Insurer written notice of such event but not later than thirty (30) days after the effective date of the event, together with such information as the Insurer may require.

In the event an organization ceases to be an **INSURED ENTITY** before or after the inception of this policy, coverage with respect to such **INSURED ENTITY** and its **INSUREDS** shall continue until termination of the **POLICY PERIOD** but only with respect to **CLAIMS** for acts, errors or omissions in the performance of **PROFESSIONAL SERVICES** or **CLAIMS** for **WRONGFUL ACTS** by INSUREDS prior to the date such organization ceased to be an **INSURED ENTITY.**

## H. Newly Acquired Insureds

1. Any entity newly acquired or formed during the **POLICY PERIOD,** and over which an **INSURED ENTITY** maintains ownership or majority interest, and the total value of the cash, securities, assets and other consideration for the purchase, or total initial value of the capitalization of a newly formed or acquired entity, does not exceed twenty-five percent (25%) of the total assets of the **NAMED INSURED** as reported in the most recent audited consolidated financial statement, will qualify as an **INSURED ENTITY** if there is no other available coverage similar to this policy. No coverage will be provided under this policy for any act, error or omission in the performance of **PROFESSIONAL SERVICES** or for **WRONGFUL ACTS** committed prior to the date the entity was acquired or formed.

2. Any entity newly acquired or formed during the **POLICY PERIOD,** and over which an **INSURED ENTITY** maintains ownership or majority interest, and the total value of the cash, securities, assets and other consideration for the

PH0040

purchase, or total initial value of the capitalization of a newly formed or acquired entity exceeds twenty-five percent (25%) of the **NAMED INSURED'S** assets, then such entity will be deemed an **INSURED ENTITY** subject to the following:

    **a.** The **NAMED INSURED** shall provide Notice to the Insurer within ninety (90) days of the formation or acquisition of the entity.

    **b.** Coverage under this policy will only apply if no other coverage similar to this policy is available to the new entity.

    **c.** Coverage under this provision is afforded only until the ninetieth (90th) day after formation or acquisition of the entity that an **INSURED** acquired or formed, or the end of the **POLICY PERIOD,** whichever is earlier.

    **d.** No coverage will be provided under this policy for any act, error or omission in the performance of **PROFESSIONAL SERVICES** or for **WRONGFUL ACTS** committed prior to Notice being provided to the Insurer.

    **e.** The **NAMED INSURED** shall provide to the Insurer such information as the Insurer may request with regard to the newly formed or acquired **INSURED ENTITY.**

    **f.** Upon receipt of such Notice and any applicable additional information, the Insurer may provide the **NAMED INSURED** with a quotation for coverage for such entity. If the **NAMED INSURED** fails within thirty (30) days following receipt of such quotation to pay any additional premium or agree to any additional coverage conditions as set forth in such quotation, coverage otherwise afforded by this section for such newly acquired or formed entity shall terminate upon expiration of the aforementioned ninety (90) day coverage period. If the Insurer chooses not to provide a quote for such newly acquired or formed entity, then any coverage afforded by this provision shall terminate ninety (90) days after formation or acquisition of the entity.

**3.** Coverage does not apply to **AGENCY/BROKERAGE SERVICES** performed by or on behalf of the newly acquired or formed **INSURED ENTITY** prior to the date an **INSURED** acquired or formed the **INSURED ENTITY** unless the Insurer endorses written consent for such coverage to this policy.

**I.** **Severability**

**1.** By acceptance of this policy, all **INSUREDS** and any successors in interest agree that the statements in the application and all other material furnished with the application are their agreements, representations and warranties, that they shall be deemed material and incorporated as part of this policy, and that this policy is issued in reliance on the truth of such agreements and representations.

**2.** As to **Insuring Agreements A. and D.,** in the event that such agreements, representations and/or warranties are misstated, incomplete or untrue, this policy shall become void and all insurance hereunder shall be forfeited. As to **Insuring Agreement C.,** any **CLAIM** which is not covered by this policy due to the operation of this section **2.** shall also have no coverage under **Insuring Agreement C.**

**3.** As to **Insuring Agreement B. and E.,** any such misstated, incomplete or untrue agreement, representation and/or warranty shall be not be imputed to any **INSURED** other than:

a. an **INSURED** who had actual or constructive knowledge of such misstatement, incomplete statement or untrue statement;

b. an **INSURED ENTITY** to the extent it indemnifies any person identified in section **a.** above;

c. an **INSURED ENTITY'S** president, chief executive officer, chief financial officer, controller, chief operating officer, chairman of the board, employed or retained corporate counsel or general counsel, or any person holding a similar position without regard to title, or any other **DIRECTOR OR OFFICER** who had knowledge of the facts not fully or truthfully disclosed, even if such person did not have knowledge that the Application contained such misstated, incomplete or untrue statement of facts; or

d. an **INSURED ENTITY** of whom an individual identified in subpart **a.** or **c.** above is an employee, **DIRECTOR OR OFFICER.**

As to **Insuring Agreement C.,** any CLAIM which is not covered by this policy due to the operation of this section **3.** shall also have no coverage under **Insuring Agreement C.**

## J. False or Fraudulent Claims

If any **INSURED** shall tender for coverage any **CLAIM** knowing the same to be false or fraudulent as regards amount or otherwise, this insurance shall become void and all insurance provided forfeited to such **INSURED** from the date of tendering such false or fraudulent **CLAIM.**

## K. Subrogation

In the event of any payment under this policy, the Insurer shall be subrogated to all the **INSURED'S** rights of recovery against any person or organization and the **INSURED** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **INSUREDS** shall do nothing to prejudice such rights. The Insurer shall be entitled to first priority in recovery or subrogation even if any or all **INSUREDS** have not been made whole.

## L. Assignment or Transfer

The interest of any **INSURED** under this policy shall not be assigned or transferred to any other person or entity without the Insurer's prior written consent.

## M. Termination of Policy

This policy shall terminate at the earliest of the following times:

1. The effective date of termination specified in a written prior notice by the **NAMED INSURED** to the Insurer;

2. Upon expiration of the **POLICY PERIOD** as set forth in Item **2.** of the Declarations;

3. If written notice is provided by the Insurer to the **NAMED INSURED** indicating premium due and such premium is not paid within ten (10) days of the delivery of written notice, or such other time as may be provided by applicable state law; or

4. At such other time as may be agreed upon by the Insurer and the **NAMED INSURED.**

The Insurer shall refund the unearned premium computed at customary short rates if this policy is terminated by the **NAMED INSURED.** Under any other circumstances the refund shall be computed pro rata.

If any period of notice herein is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to equal the minimum period of notice required by such law.

## N. Notice, Authority and Changes

### 1. The Insurer

Notice to the Insurer as required under this policy shall be sent to NAMIC Insurance Company, Inc.,3601 Vincennes Road, Post Office Box 68700, Indianapolis, Indiana 46268.

Notice to any of the Insurer's agents or knowledge possessed by such an agent or by any other person shall not be notice to the Insurer, nor shall it effect a waiver or change in any part of this policy nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

### 2. INSUREDS

By acceptance of this policy, the **NAMED INSURED** agrees to act on behalf of all **INSUREDS** with respect to the giving and receiving of notice and cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining to exercise any right to the Extended Reporting Period Option. By acceptance of this policy, all **INSUREDS** agree to the **NAMED INSURED** acting on their behalf with regard to giving and receiving of notice and cancellation or any other transactions regarding the policy.

## O. Action Against Insurer

No action shall lie against Insurer unless, as a condition precedent thereto, the **INSUREDS** have fully complied with all the terms of this policy, nor until the amount of the **INSURED'S** obligation to pay shall have been finally determined either by judgment against the **INSURED** after actual trial, final appeal or by written agreement of the **INSURED,** the claimant and the Insurer.

Any person, organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy.

Nothing contained in this policy shall give any person or organization any right to join the Insurer as a party or co-defendant in any action against the **INSURED** to determine the **INSURED'S** liability, nor shall the **INSUREDS** implead the Insurer or its legal representatives.

## P. Reimbursement of Insurer

In the event of any payment by the Insurer as **CLAIM EXPENSE** or **LOSS** with regard to a **CLAIM** as to which it is determined by judgment or settlement or decision of an arbitrator that the policy provided no coverage for such **CLAIM,** all **INSUREDS** shall be liable to reimburse the Insurer for **LOSS** or **CLAIM EXPENSE** payments. In the event the Insurer files suit or any other legal action to obtain this reimbursement, all **INSUREDS** shall be liable to the payment of the

reimbursement as well as the Insurer's legal fees and costs, including attorney fees incurred by the Insurer seeking the reimbursement of such **LOSS** or **CLAIM EXPENSES.**

**Q. Policy Proceeds**

In the event of insolvency or bankruptcy of an **INSURED ENTITY,** the payment of **LOSS** and **CLAIM EXPENSE,** shall first be for the benefit of the **DIRECTORS AND OFFICERS** or individual employees, and shall not be for the benefit of the **INSURED ENTITY.**

**R. Bankruptcy**

Bankruptcy or insolvency of an **INSURED** or of an **INSURED'S** estate shall not relieve the Insurer of any of its obligations under this policy.

**S. Effect of Section Headings**

Section headings or titles are inserted for convenience only and shall not be construed as interpretations of text.



NAMIC Insurance Company, Inc.
3601 Vincennes Road | P O Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC   Fax (317) 872-5636 | www.namcinsurance.com

(A Stock Insurance Company. Hereafter Called the "Insurer".)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## DEDUCTIBLE

*Policy Number:*  C01330015  *Endorsement Number:*  1  *Effective Date:*  9/30/2015
*Named Insured:*  Pharmacists Mutual Insurance Company

In consideration of the premium shown below, it is hereby understood and agreed that Item 4.
of the Declarations, **DEDUCTIBLES**, is amended to read as follows:

Insuring Agreements A., C., and E.:      $250,000 each **CLAIM**

Insuring Agreement B.:                          $50,000  each **CLAIM**

_____            /_____
AUTHORIZED REPRESENTATIVE                            DATE

NIC-E-29 (5/00)                          Page 1 of 1



**NAMIC Insurance Company, Inc.**
3601 Vincennes Road | P. O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC | Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer".)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED—INSURED ENTITY

*Policy Number:*  C01330015  *Endorsement Number:*  2  *Effective Date:*  9/30/2015
*Named Insured:*  Pharmacists Mutual Insurance Company

1.  It is hereby understood and agreed that the entity(ies) named below are added as **INSURED ENTITIES:**

   **PHARMACISTS LIFE INSURANCE COMPANY**

   **PHARMACISTS MUTUAL FOUNDATION**

2.  Item 6. of the Declarations page is amended as follows for the above named **Additional Insured:**

   **6.  PRIOR ACTS DATE:** _____

   If no entry appears above, the **PRIOR ACTS DATE** required to complete this endorsement will be shown in Item 6. of the Declarations.

3.  Item 3. of the Declarations page is amended as follows for the above named **Additional Insured:**

   **3.  LIMITS OF LIABILITY**

   $ _____ each **CLAIM,** subject to

   $ _____ in the aggregate for all **CLAIMS** for the **POLICY PERIOD**

   These limits are part of and not in addition to the limits shown in Item 3. of the Declarations

   If no entry appears above, the **LIMITS OF LIABILITY** required to complete this endorsement will be shown in Item 3. of the Declarations.

**All other terms, conditions and limitations remain unchanged.**

_____ / _____
AUTHORIZED REPRESENTATIVE                                      DATE

NIC-E-101 (2-11)                                      Page 1 of 1

PH0046



NAMIC Insurance Company, Inc.
3601 Vincennes Road | P O Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC   Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer".)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED

*Policy Number:*   C01330015  *Endorsement Number:*  3  *Effective Date:*  9/30/2015
*Named Insured:*   Pharmacists Mutual Insurance Company

1. The **Advisory Board Members of Pharmacists Mutual Insurance Company** is added as an **INSURED**, while acting within the scope of his or her duties for an **INSURED ENTITY**, but only for coverage provided under the policy as indicated in the Schedule of this endorsement.

2. The following coverages provided under the policy (indicated by an "x") apply to the natural person listed above:

### SCHEDULE

☐ **A. Insurance Company Professional Liability** as provided under Section I. **INSURING AGREEMENTS** of the policy.

☒ **B. Directors & Officers Liability** as provided under Section I. **INSURING AGREEMENTS** of the policy.

☒ **C. Investigation, Defense and Settlement** as provided under Section I. **INSURING AGREEMENTS** of the policy but only, for **CLAIMS** covered under coverages also Scheduled on this endorsement.

☐ **D. Supplemental Coverage, 2. Liability for Release of Protected Information** as provided under Section I. **INSURING AGREEMENTS** of the policy.

☒ **D. Supplemental Coverage, 3. Hearings Before Administrative Bodies For Employment Discrimination** as provided under Section I. **INSURING AGREEMENTS** of the policy.

☐ **D. Supplemental Coverage, 4.** Reimbursement for actual extra expenses incurred as a result of a **DATA PROCESSING** failure caused by the acts, errors or omissions of a **DATA PROCESSING** vendor as provided under Section I. **INSURING AGREEMENTS** of the policy.

☒ **E. Reimbursement and Indemnification** as provided under Section I. **INSURING AGREEMENTS** of the policy.

☐ _____ but only, as provided under the _____ endorsement attached to the policy.

☐ _____ but only, as provided under the _____ endorsement attached to the policy.

☐ _____ but only, as provided under the _____ endorsement attached to the policy.

# NAMICO®

(A Stock Insurance Company, Hereafter Called the "Insurer".)

NAMIC Insurance Company, Inc.
3601 Vincennes Road | P O Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC | Fax (317) 872-5636 | www.namicinsurance.com

3. Item 6. of the Declarations page is amended as follows for the above named **ADDITIONAL INSURED:**

6. **PRIOR ACTS DATE:** _____/_____ /_____

If no entry appears above, the **PRIOR ACTS DATE** required to complete this endorsement will be shown in Item 6. of the Declarations.

4. Item 3. of the Declarations page is amended as follows for the above named **ADDITIONAL INSURED:**

3. **LIMITS OF LIABILITY:**

$_____ each **CLAIM**, subject to

$_____ in the aggregate for all **CLAIMS** for the **POLICY PERIOD**

These limits are part of and not in addition to the limits shown in Item 3. of the Declarations.

If no entry appears above, the **LIMITS OF LIABILITY** required to complete this endorsement will be shown in Item 3. of the Declarations.

_____
AUTHORIZED REPRESENTATIVE                    DATE

NIC-E-29(5-00)                    Page 2 of 2



**NAMICO**®

(A Stock Insurance Company, Hereafter Called the "Insurer")

NAMIC Insurance Company, Inc.
3601 Vincennes Road | P.O. Box 68700
Indianapolis, Indiana 46268-0700
800) 33-NAMIC | Fax (317) 872-5636 | www.namicinsurance.com

# ENDORSEMENT

*Policy Number:* C01330015  *Endorsement Number:* 4  *Effective Date:* 9/30/2015
*Named Insured:* **Pharmacists Mutual Insurance Company**

It is hereby understood and agreed that the entity(ies) named below are added as **INSURED ENTITIES.**

**PMC Quality Commitment, Inc.**

The following changes, amendments and additions are applicable only to PMC Quality Commitment, Inc.:

Section II, DEFINITIONS, is amended to include the following:

**X. PROFESSIONAL SERVICES:** 15. Services performed as a risk management consultant for retail pharmacies.

Section III, EXCLUSIONS shall be amended to include the following, which are applicable to **PMC Quality Commitment, Inc.,** only.

Any **CLAIM** arising out of an attorney-client relationship between any **INSURED** and any actual or prospective customer or client.

It is agreed there shall be no coverage for any **CLAIM** made by:

1. Any independent contractor(s) who solicit(s) or solicited business on the **INSURED'S** behalf; however, David B. Brushwood, RPh, JD is an additional **INSURED** only for the risk management services and/or the solicitation of business solely on behalf of PMC Quality Commitment, Inc.
2. Any person or organization for collection, payment or return of fees, and/or any fee dispute involving any client or customer of the **INSURED ENTITIES.**

NIC-E-29 (5/00)

Page 1 of 1



NAMIC Insurance Company, Inc.
3601 Vincennes Road | P O Box 68700
Indianapolis Indiana 46268-0700
(800) 33-NAMIC | Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company. Hereafter Called the "Insurer".)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## DIRECTORS AND OFFICERS COVERAGE EXTENSION

*Policy Number:* **C01330015** *Endorsement Number:* **5** *Effective Date:* **9/30/2015**
*Named Insured:* **Pharmacists Mutual Insurance Company**

It is hereby understood and agreed that Endorsement #5 Directors and Officers Coverage Extension is deleted in its entirety and replaced with the following:

It is hereby understood and agreed that the organization listed below is a **SUBSIDIARY** of the **NAMED INSURED** and is added to the policy, but only for coverage provided under Section **I. INSURING AGREEMENTS:**

1. **B. Directors & Officer Liability;**

2. **E. Reimbursement and Indemnification; and**

3. **C. Investigation, Defense and Settlement** but, only for **CLAIMS** covered under subsections 1. and 2. above.

### PMC ADVANTAGE SERVICES, INC.
### Formerly Pro Advantage Services, Inc.

(Name of **SUBSIDIARY**)

Additional Premium: $Included

Surplus Lines Tax: $ _____

Stamping Fee: $ _____

Total: $ _____

I/We hereby understand, acknowledge and accept the terms of this endorsement. (Signature is not required if attached at the original inception date of policy.)

_____        _____
SIGNATURE OF PARTNER, OFFICER OR SOLE PROPRIETOR                      DATE

_____
TYPE NAME OF PARTNER, OFFICER OR SOLE PROPRIETOR

_____        _____
AUTHORIZED REPRESENTATIVE                                          DATE

NIC-E-4 (7-09)                     Page 1 of 1                     Issued 1-14-2014



**NAMICO®**

(A Stock Insurance Company, Hereafter Called the "Insurer".)

NAMIC Insurance Company, Inc.
3601 Vincennes Road | P. O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC  Fax (317) 872-5656 | www.namicinsurance.com

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## OUTSIDE DIRECTORSHIP COVERAGE
### (SPECIFIED INDIVIDUAL/ENTITIES)

*Policy Number:* C01330015   *Endorsement Number:* 6   *Effective Date:* 9/30/2015
*Named Insured:*  Pharmacists Mutual Insurance Company

It is hereby understood and agreed that this policy, subject to the terms and conditions, is hereby extended to include coverage for **LOSS** and **CLAIM EXPENSE** in connection with **CLAIMS** made against the specified **DIRECTORS OR OFFICERS** of an **INSURED ENTITY** arising out of their services as a **DIRECTOR OR OFFICER** of the **OUTSIDE ENTITY** named below, provided that:

(a)  such services are part of their regularly assigned duties with the **INSURED ENTITY**; and

(b)  such services are provided with the specific consent or direction of the Board of Directors of the **INSURED ENTITY**.

It is further understood and agreed that:

(1)  Coverage provided by this endorsement is available only to the extent that the specified **DIRECTORS OR OFFICERS** are not indemnified by the **OUTSIDE ENTITY**.

(2)  This extension of coverage is to be in excess of any other insurance including but not limited to Directors' and Officers' Liability Insurance and/or Directors' and Officers' reimbursement insurance provided for, to or by the **OUTSIDE ENTITY**.

(3)  Coverage provided by this endorsement is only available to the following **DIRECTORS OR OFFICERS** arising out of their services as a **DIRECTOR OR OFFICER** of the following **OUTSIDE ENTITIES**:

| Outside Entity | Directors And Officers |
|---|---|
| Pharmacy Marketing Group, Inc. | Pat Reding  (Board of Directors)<br>Tom Goodrich (Board of Directors)<br>Jonathan Grether (Board)<br>Steve Hoskins (Board of Directors)<br>Ed Yorty (Board) |
| Property & Casualty Insurance Association Of America | Kevin Banwart (Financial Issues Committee)<br>Mary Paulsen (Accounting Sub-Committee)<br>Ed Yorty (Executive Advisory Board) |

NIC-E-106 (10-09)                              Page 1 of 3

PH0051

# NAMICO®

(A Stock Insurance Company, Hereafter Called the "Insurer")

NAMIC Insurance Company, Inc.
3601 Vincennes Road | P. O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC | Fax (317) 877-5636 | www.namicinsurance.com

| | |
|---|---|
| University of Iowa College of Pharmacy | Ed Yorty (Executive. Leadership Board) |
| Sullivan Building Foundation | Jon Grether (VP, Board of Directors) |
| Pharmacists Mutual Foundation | Jon Grether (President, Board of Directors) |
| Kossuth County Economic Development | Steve Hoskins (Board) |
| Kossuth County Shrine Club | Steve Hoskins (Board) |
| Knights of Columbus, Algona | Bill Weibelhaus (Treasurer) |
| Algona Municipal Utilities | Julie Murphy (Board) |
| Specialty Sterile Pharmaceutical Society | Donnie Calhoun ( Executive Director) |
| NCPA Foundation | Donnie Calhoun (Board) |
| American Pharmaciy Association | Steven Simenson (Past President) |



**NAMIC Insurance Company, Inc.**
3601 Vincennes Road | P. O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC | Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer")

| | |
|---|---|
| National Community Pharmacists Association | Holly Henry (Past president) |
| AmerisourceBergen Good Neighbor Pharmacy | Randall Myers (Advisory Board) |
| Ohio Pharmacists Foundation | Randall Myers (Board) |
| American Pharmacy Services Corporation | Randall Myers (Board) |
| Community Pharmacy Foundation | Randall Myers (Board) |
| International Academy of Compounding Pharmacists | Richard Moon (Board) |
| Minnesota Pharmacists Foundation | Steven Simenson (Board) |
| CSC P&C Industry | Bill Weibelhaus |

All other terms and conditions remain unchanged.

_____     /_____
AUTHORIZED REPRESENTATIVE              DATE

Page 3 of 3

NIC-E-106 (10-09)

063
PH0053



NAMIC Insurance Company, Inc.
3601 Vincennes Road | P O Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC · Fax (317) 872-5636 | www.namic-insurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer".)

## INVESTIGATORY EXPENSE ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

*Policy Number:* C01330015 *Endorsement Number:* 7 *Effective Date:* 9/30/2015
*Named Insured:* **Pharmacists Mutual Insurance Company**

It is hereby understood and agreed that Section 1.INSURING AGREEMENTS, Supplemental Coverage, is amended to include the following:

The Insurer will reimburse an **INSURED ENTITY or INSURED** for actual expenses, including legal or accounting fees charged by an outside lawyer, accountant or auditor, incurred by the **INSURED ENTITY** or an **INSURED** as a result of activities related to or arising from an investigation conducted by or on behalf of an **INSURED ENTITY** or the **DIRECTORS AND OFFICERS** relating to:

1) A derivative demand made by a policyholder or shareholder;
2) An informal inquiry, response to a subpoena or formal inquiry by the Securities and Exchange Commission;
3) An informal inquiry, response to a subpoena or formal inquiry by a state financial institution or securities regulatory authority; or
4) A formal inquiry or response to a subpoena received from an insurance regulatory authority.

Expenses payable under this coverage shall not include:

a) expenses incurred for public relations or media consultants or representatives;
b) wages, salary, benefits or administrative or overhead expenses of any **INSURED;**
c) **LOSS**, Fines, Penalties or reimbursements owed to a regulatory authority as a result of the regulator's initiation of the formal or informal inquiry or issuance of a subpoena.

Payments made under this coverage shall be deemed CLAIM EXPENSE, and shall be limited to $100,000.

All other terms, conditions and limitations remain unchanged

NIC-E-717 (7-11)

064
PH0054



**NAMIC Insurance Company, Inc.**
3601 Vincennes Road | P.O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC  Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer".)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCESS INDEMNIFICATION COVERAGE PART

*Policy Number:*  C01330015  *Endorsement Number:*  8  *Effective Date:*  9/30/2015
*Named Insured:*  Pharmacists Mutual Insurance Company

Subject to the Terms and Conditions hereinafter set forth, the following coverage is added to this policy:

**INSURING AGREEMENT**

As to a CLAIM first made during the POLICY PERIOD and reported in writing by an INSURED to the Insurer during the POLICY PERIOD or applicable Extended Reporting Period alleging any WRONGFUL ACT of a DIRECTOR OR OFFICER of an INSURED, committed solely in their individual or collective capacities as such, on or after the PRIOR ACTS DATE, the Insurer shall indemnify a DIRECTOR OR OFFICER of an INSURED ENTITY if the INSURED ENTITY fails or refuses, including by reason of FINANCIAL IMPAIRMENT, to indemnify a DIRECTOR OR OFFICER for LOSS or CLAIM EXPENSE to the fullest extent as permitted or required under the Bylaws or Articles of Incorporation of the INSURED ENTITY, or controlling state law of the domicile state of the INSURED ENTITY. The Limits of Liability payable for LOSS under this Insuring Agreement are in addition to, and not part of, the Limits of Liability shown on the policy Declarations Page.

**EXCESS COVERAGE ONLY**

The coverage provided by this endorsement is excess of the limits of any collectible limits under any policy providing the same or similar coverage for the WRONGFUL ACTS of DIRECTORS AND OFFICERS, including the policy to which this endorsement is attached, without regard to whether such other policies are deemed to be excess.

**LIMITS OF LIABILITY**

$1,000,000 shall apply in the aggregate to all CLAIMS in any POLICY PERIOD against any and all DIRECTORS AND OFFICERS under this endorsement.

No deductible shall apply to any payment under this coverage.

All other terms and conditions of the Policy remain unchanged.

NIC-EAC-758 (07/14)                    Page 1 of 1



**NAMIC Insurance Company, Inc.**
3601 Vincennes Road | P O Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC  Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer")

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## DEFINITIONS – OUTSIDE ENTITY

*Policy Number:*  C01330015  *Endorsement Number:*  9  *Effective Date:*  9/30/2015
*Named Insured:*  **Pharmacists Mutual Insurance Company**

The **DEFINITIONS** section of the policy describing **OUTSIDE ENTITY** is deleted in its entirety and replaced with the following:

**OUTSIDE ENTITY**

**OUTSIDE ENTITY** shall mean any non-profit corporation, fund, foundation, or any eleemosynary organization other than the **INSURED** that is exempt from federal income tax or any corporation or organization that is listed by endorsement to this policy.

All other terms and conditions of the Policy remain unchanged.

NIC-EAC-754 (07/14)                     Page 1 of 1



NAMIC Insurance Company, Inc.
3601 Vincennes Road | P. O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC | Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer".)

## AMENDED DEFINITIONS – SUBSIDIARY

*Policy Number:* **C01330015** *Endorsement Number:* **10** *Effective Date:* **9/30/2015**
*Named Insured:* **Pharmacists Mutual Insurance Company**

The **DEFINITIONS** section of the policy describing **SUBSIDIARY** is deleted in its entirety and replaced with the following:

    **SUBSIDIARY** shall mean any organizations in which the **NAMED INSURED** owns or controls, directly or indirectly, more than fifty percent (50%) of the voting securities or voting rights representing the right to vote for election of directors. However, if the assets of such an organization exceed twenty-five percent (25%) of the assets of the **NAMED INSURED,** then such organization must be separately endorsed to this policy to be a **SUBSIDIARY.** To be an **INSURED ENTITY,** a **SUBSIDIARY** must be listed in the application which formed the basis of this policy.

    **SUBSIDIARY** shall not include any federal or state chartered bank, savings and loan, credit union, thrift, consumer lending entity, premium finance entity, mortgage broker, mortgage lender, insurance agency or any entity engaged in the business of managing, developing, or maintaining real estate or structures, including commercial office buildings or properties, residential buildings or properties, or investment buildings or properties of any kind, unless added by specific endorsement.

All other terms and conditions of the Policy remain unchanged.

NIC-EAP-772 (02/15)             Page 1 of 1



NAMIC Insurance Company, Inc.
3601 Vincennes Road | P. O Box 68700
Indianapolis, Indiana 46268-0700
.800) 33-NAMIC | Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer".)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION E

*Policy Number:* C01330015 *Endorsement Number:* 11 *Effective Date:* 9/30/2015
*Named Insured:* **Pharmacists Mutual Insurance Company**

It is hereby understood and agreed that Section III EXCLUSIONS, Item E. is deleted in its entirety and replaced with the following:

E. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to:

1. any acts, errors or omissions in the performance of or capacity as:

    a. an investment banker, investment underwriter, investment advisor, investment agent, trustee or promoter;

    b. selling, administering, managing or arranging viatical settlements;

    c. the sale, distribution or servicing of mutual funds, variable annuities, or securities of any type;

    d. providing a guarantee, opinion or belief as to the future value of an investment; or

    e. the sale, operation, creation, organization or management of a Multiple Employer Welfare Arrangement or plan (MEWA); or

NIC-E-29 (5-00)                                   Page 1 of 1



NAMIC Insurance Company, Inc.
3601 Vincennes Road | P. O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer".)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDED EXCLUSION F.

*Policy Number:* C01330015 *Endorsement Number:* 12 *Effective Date:* 9/30/2015
*Named Insured:* Pharmacists Mutual Insurance Company

Exclusion **F.** is deleted in its entirety and replaced by the following:

F. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to **WRONGFUL ACTS** of a **DIRECTOR OR OFFICER** committed in a capacity as **DIRECTOR OR OFFICER** of any entity other than for an **INSURED ENTITY**, as defined. This exclusion shall not apply to any such **DIRECTORS OR OFFICERS** who serve at the specific request of the **INSURED ENTITY** as a **DIRECTOR OR OFFICER** of any **OUTSIDE ENTITY** provided that the coverage afforded to such **DIRECTORS OR OFFICERS** by this policy shall be excess of any indemnification or insurance afforded by the **OUTSIDE ENTITY;**

All other terms and conditions of the Policy remain unchanged.

NIC-EAC-759 (07/14)                    Page 1 of 1



**NAMICO®**

(A Stock Insurance Company, Hereafter Called the "Insurer".)

NAMIC Insurance Company, Inc.
3601 Vincennes Road | P. O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC   Fax (317) 872-5636 | www.namicinsurance.com

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDED EXCLUSION N.

*Policy Number:* C01330015 *Endorsement Number:* 13 *Effective Date:* 9/30/2015
*Named Insured:* Pharmacists Mutual Insurance Company

The following paragraph of Exclusion **N.** is deleted in its entirety:

a **CLAIM** brought by a past **DIRECTOR OR OFFICER** who has not held that office for three or more years prior to the filing of the **CLAIM**;

And replaced with the following:

a **CLAIM** brought by a past **DIRECTOR or OFFICER** who has not held that office for two (2) or more years prior to the date the **CLAIM** was made;

All other terms and conditions of the Policy remain unchanged.

NIC-EAC-760 (07/14)                              Page 1 of 1



NAMIC Insurance Company, Inc.
3601 Vincennes Road | P. O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC   Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer".)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSIONS – POLLUTION CLAIM

*Policy Number:* **C01330015** *Endorsement Number:* **14** *Effective Date:* **9/30/2015**
*Named Insured:* **Pharmacists Mutual Insurance Company**

For the purposes of this endorsement, **POLLUTION CLAIM** shall mean a **CLAIM** arising out of the actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of **POLLUTANTS** in to or on to real or personal property, water (potable or otherwise) or the atmosphere.

The following paragraphs of the **EXCLUSIONS** section of the policy are deleted in their entirety:

any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to:

1. the actual, alleged, or threatened discharge, release, escape, seepage, migration or disposal of **POLLUTANTS** into or on real or personal property, water (potable or otherwise) or the atmosphere; or

2. any direction or request that an **INSURED** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **POLLUTANTS**, or any voluntary decision to do so;

And replaced with the following:

any **CLAIM** directly arising from, based upon, attributable to, or related in any way to:

1. the actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of **POLLUTANTS** into or on to real or personal property, water (potable or otherwise) or the atmosphere; or

2. any direction or request that an **INSURED** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **POLLUTANTS**, or any voluntary decision to do so;

3. This exclusion shall not apply to a **CLAIM** alleging an act, error or omission in the performance of **PROFESSIONAL SERVICES** arising out of a **POLLUTION CLAIM**, as long as such act, error or omission does not result in the actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of **POLLUTANTS** by an **INSURED**.

All other terms and conditions of the Policy remain unchanged.

NIC-EAC-745 (07/14)                    Page 1 of 1



NAMIC Insurance Company, Inc.
3601 Vincennes Road | P O Box 68700
Indianapolis, Indiana 46268-0700
(800, 33-NAMIC   Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer".)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## INSURED'S DUTIES IN THE EVENT OF CLAIM
## AMENDATORY ENDORSEMENT

*Policy Number:*  C01330015  *Endorsement Number:* 15  *Effective Date:* 9/30/2015
*Named Insured:*  **Pharmacists Mutual Insurance Company**

It is hereby understood and agreed that Item 1.of Condition B.  **Insured's Duties in the Event of Claim,** of Section **IV. GENERAL CONDITIONS** is deleted and replaced with the following:

**B.  Insured's Duties in Event of Claim**

In the event of a **CLAIM**, it is a condition precedent to the **INSURED'S** rights under this policy that:

1.  the **INSURED** shall immediately forward to the Insurer or its authorized representative written notice of any **CLAIM(S),** including every demand, notice, summons or other process received by the **INSURED** or the **INSURED'S** representative as soon as practicable but in no event shall such notice be received by the Insurer later than ninety (90) days after the expiration date of the **POLICY PERIOD,** or during the Extended Reporting Period (if applicable), as required by the **Insuring Agreements;**

All other terms and conditions of the Policy remain unchanged.

NIC-E-765-(07/14)                                 Page 1 of 1



NAMIC Insurance Company, Inc.
3601 Vincennes Road | P. O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 53-NAMIC   Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer")

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## GENERAL CONDITIONS - OTHER INSURANCE

*Policy Number:* **C01330015** *Endorsement Number:* **16** *Effective Date:* **9/30/2015**
*Named Insured:* **Pharmacists Mutual Insurance Company**

It is hereby understood and agreed that GENERAL CONDITIONS, Other Insurance section of the policy is deleted in its entirety and replaced by the following:

### GENERAL CONDITIONS

**Other Insurance**

This insurance is primary to any other valid and collectible insurance or reinsurance.

If other valid collectible insurance or reinsurance is available to the INSURED for a LOSS and/or CLAIM EXPENSE covered under this policy, the Insurer's obligations are not affected unless any of the other insurance or reinsurance is also primary. Then, the Insurer will share with all that other insurance or reinsurance by the method described below.

Method of Sharing:

If all of the other insurance or reinsurance permits contribution by equal shares, this policy will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the LOSS remains, whichever comes first.

If any of the other insurance or reinsurance does not permit contribution by equal shares, this policy will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

All other terms and conditions of the Policy remain unchanged.

NIC-EAC-766 (07/14)                    Page 1 of 1



NAMIC Insurance Company, Inc.
3601 Vincennes Road | P.O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC   Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer".)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CHANGES—IOWA

*Policy Number:* **C01330015** *Endorsement Number:* **17** *Effective Date:* **9/30/2015**
*Named Insured:* **Pharmacists Mutual Insurance Company**

The **Termination of Policy** Condition contained in the **GENERAL CONDITIONS** section of the policy is deleted in its entirety.

The following Conditions are added to the **GENERAL CONDITIONS** section of the policy and supersede any provisions to the contrary:

**Cancellation**

1.  This policy may be canceled by the **NAMED INSURED** by surrender thereof to the Insurer or by mailing to the Insurer written notice stating when thereafter such cancellation shall be effective.

2.  If this policy has been in effect for less than sixty (60) days and is not a renewal, the Insurer may cancel this policy by mailing or delivering written notice of cancellation to the **NAMED INSURED**. The Insurer may cancel for:

    a.  loss of reinsurance subject to 4. below; or

    b.  any other reason.

3.  If this policy has been in effect for sixty (60) days or more, or this is a renewal or continuation of a policy issued by the Insurer, the Insurer may cancel this policy only for one or more of the following reasons:

    a.  Nonpayment of premium;

    b.  Misrepresentation or fraud made by or with the **INSURED'S** knowledge in obtaining the policy, or in presenting a **CLAIM** under the policy;

    c.  Acts or omissions by the **INSURED** that substantially change or increase the risk insured;

    d.  Determination by the Commissioner of Insurance that the continuation of the policy would jeopardize the solvency of the Insurer or would place the Insurer in violation of the insurance laws of this or any other state;

    e.  The **INSURED** has acted in a manner which the **INSURED** knew or should have known was in violation or breach of a policy term or condition; or

    f.  Loss of reinsurance, subject to 4. below.

NIC-E-40-IA (3-11)

074
PH0064

# NAMICO®

NAMIC Insurance Company, Inc.
3601 Vincennes Road | P. O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC Fax (317) 872-5636 | www.namicinsurance.com

(A Stock Insurance Company, Hereafter Called the "Insurer".)

4. The Insurer may cancel this policy due to loss of reinsurance which provides coverage to the Insurer for a significant portion of the underlying risk insured, but only if the Commissioner of Insurance determines that such cancellation is justified.

5. The Insurer may cancel this policy by mailing or delivering written notice of cancellation to the **NAMED INSURED** at least:

    a. thirty (30) days before the effective date of cancellation if the Insurer cancels for loss of reinsurance coverage; or

    b. ten (10) days before the effective date of cancellation if the Insurer cancels for any other reason.

6. The Insurer will mail or deliver its notice to the **NAMED INSURED'S** last mailing address known to the Insurer.

7. Notice of cancellation will state the reason or reasons for cancellation and the effective date of cancellation. The **POLICY PERIOD** will end on that date.

8. If the policy is canceled, the Insurer will send the **NAMED INSURED** any premium refund due. If the Insurer cancels, the refund will be pro rata. If the **NAMED INSURED** cancels, the refund may be less than pro rata. The cancellation will be effective even if the Insurer has not made or offered a refund.

9. If notice is mailed, a post office department certificate of mailing is proof of receipt of notice. However, if cancellation is for nonpayment of premium, a certificate of mailing is not required.

**Nonrenewal**

1. If the Insurer decides not to renew this policy, the Insurer will mail or deliver written notice of nonrenewal to the **NAMED INSURED** at least forty-five (45) days before the expiration date of this policy, except if:

    a. the Insurer has offered to issue a renewal policy; or

    b. the **NAMED INSURED** has failed to pay a premium due or any advance premium required by the Insurer for renewal.

    Nonrenewal of a policy includes a decision by the Insurer not to renew the policy, an increase in the premium of twenty-five percent (25%) or more, an increase in the deductible of twenty-five percent (25%) or more, or a material reduction in the limits or coverage of the policy. However, a premium charge which is assessed after the beginning date of the policy period for which the premium is due shall not be deemed a premium increase for the purpose of this condition.

2. If notice is mailed, a post office certificate of mailing is proof of receipt of notice.

NIC-E-40-IA (3-11)

Page 2 of 2

NAMICO - 000937

**ZH** | **ZANER HARDEN LAW**
YOUR STORY WILL BE TOLD

September 28, 2017

Hon. William Neighbors
Judicial Arbiter Group, Inc.
1601 Blake Street
Suite #400
Denver, CO 80202

     RE:    Fed. R. Evid. 408 Correspondence

Dear Judge Neighbors:

    Thank you for your assistance during last Friday's mediation.

    Although this matter was not resolved at that time, I am authorized to make a final settlement offer of $1,000,000.00. This offer will expire next Monday, October 2, 2017 at 5 p.m. MDT, and once it does, my client will be unwilling to settle at this amount thereafter. This is not just a promise, but a guarantee. I am confident that the case will continue to get better as we continue the long-sought depositions that have been withheld up to this point.

    We respectfully ask that you share this correspondence with Defendant and its counsel. As we stated last Friday, we are not concerned whatsoever with defeating PMIC's Motion for Partial Summary Judgment. Although we will be asking the Court to delay even considering the Motion before other discovery – including the six other depositions we still need to take – is completed pursuant to Fed. R. Civ. Pro. 56(d), both the law and the facts support denying the Motion. Defendant's cited cases, which all deal with a third-party making coverage representations in contravention of the insurance policy at-issue, are all inapposite to the facts of this case. Here, Defendant itself interpreted the Policy at Ms. Schock's request and then issued a written opinion stating in no uncertain terms that up to $500,000.00 in UM benefits was available. Similarly, PMIC admitted at its deposition that neither the law nor the Policy prevented it from allowing the policies to stack and offering more than $100,000.00 in benefits.

    As a side note, I strongly encourage whomever is the decision maker at PMIC to read Mr. Davis' deposition. From shredding documents, to looking for countless ways to deny their insured benefits, the whole file is "embarrassing" to use Mr. Davis' own words.

    Once the Motion for Summary Judgment is defeated, PMIC realistically faces exposure of $3-5 million.

    First, the jury will surely award Ms. Schock the full amount of the Policy's remaining benefits – $287,000 – as Ms. Schock's damages at the time PMIC had the demand was equal to $500,000. PMIC's own internal evaluation concluded the case was valued $500,000.00 (reserve number). Once the jury checks the box at trial that PMIC unreasonably delayed and denied her claim, this number will then be tripled per C.R.S. § 10-3-1116 for "two times the covered benefit," bringing the damages up to $861,000.00 ($287,000.00 + 2 x $287,000.00).



**EXHIBIT**
**3**

1610 WYNKOOP STREET SUITE #120
DENVER CO 80202 I ZANERHARDENLAW.COM
P 303 563 5354 I F 303 563 5351

**ZH | ZANER HARDEN LAW**

Next, the jury will also award significant economic and noneconomic damages related to PMIC's bad faith breach of contract. PMIC's behavior in "unfortunately" determining that it would have to pay its insured the full $500,000.00 and then finding ways not to have caused Kim untold stress, anxiety, and worry. The stress of the lawsuit has prevented my client from focusing on other parts of her life – most importantly, continuing to heal. The litigation has likewise interfered with repairing her interpersonal relationships, especially those with her husband and grandchildren. After meeting this sweet grandmother and hearing about (1) how the crash destroyed her life and (2) how poorly PMIC treated her afterwards, I believe the jury will award her at least another $1,000,000.00 in total noneconomic damages. The Court can adjust this award to double the non-economic cap since the damages are clear and convincing ($950,000.00). This already raises the verdict to $861,000 + $950,000 = $1,811,000 million.

At mediation we described to Your Honor the shocking ways in which PMIC documented its handling of my client's claim. The notes nearly audibly state PMIC's disappointment at having to pay the $500,000.00 policy limits – language which even PMIC admitted was "embarrassing." Listing PMIC's IME doctor's conclusion that the treatment was related as a weakness (as well as the fact their insured had no prior back pain), PMIC's all out assault trying to find reasons not to pay is textbook bad faith. When you factor in their eleventh hour roundtables fishing for ways to reduce the coverage amount, and then actually reducing it after offering $287,000.00, this conduct rises well above bad faith into *willful and wanton* territory. As a result, we have little doubt that the Court will allow a claim for exemplary damages to go before the jury, especially since the bar for permitting this claim is so low. And when the jury learns of PMIC's conduct, I think it will be motivated to act and punish this multi-hundred million-dollar insurance company for its behavior, awarding $2 million in exemplary damages.

Normally, judgment on an award of exemplary damages is only permitted on a 1:1 ratio when compared with an award of actual damages. However, as Your Honor knows, this award may be increased up to a 3:1 ratio when the circumstances of C.R.S. § 13-21-102(3)(a) or (b) are met – when the defendant has repeated the action alleged in the lawsuit in a willful and wanton manner or the defendant's behavior has further aggravated the plaintiff's damages. Here, PMIC continued its willful and wanton bad faith behavior even after we initiated litigation. As described in the sanctions Motions, PMIC destroyed evidence, failed to disclose obviously discoverable documents, and intentionally disobeyed Court orders. PMIC is still in contempt of the Court's August 29, 2017 Order. Accordingly, PMIC's utter disregard for fairness in litigation is an extension of its failure to fairly evaluate Ms. Schock's claim.

Conservatively, I believe Judge Moore will find aggravated conduct and allow for the full $2 million award. Adding that to the existing $1,811,00 brings the verdict up to $3,811,000; even if Judge Moore cuts it down to a 1:1 ratio, that leaves the punitive award at $1,811,000 ($950,000 + $861,000 in actual damages) and a grand total verdict of $3,622,000 million. This is all before interest, attorney fees, and costs, which are permitted under the delay/denial statute and federal law. As experienced litigators handling this enormously complex case, my rate is $500.00 per hour and Mr. Singer's will be $275.00 per hour. As Your Honor can imagine, we have already spent hundreds of hours working this case – and we have only taken one deposition so far.

NAMICO - 000939

**ZH** | ZANER HARDEN LAW
YOUR STORY WILL BE TOLD

In case PMIC doubts that its exposure is in the $3-5 million range, please remind them that Michael Rosenberg will be joining us as co-counsel. Mr. Rosenberg is not only *the* go-to guy for plaintiff's insurance bad faith here in Colorado, he is also an outstanding trial attorney who just a few years ago helped obtain a *$4 million* exemplary damages award in another case, *Casper v. Guarantee Trust Life Insurance Company*, No. 14CA2423, 2016 WL 6803070, at *1 (Colo. App. Nov. 17, 2016). Mike was able to do so in highly conservative Pueblo County and with facts that are arguably less egregious than those here.

All this, of course, leaves out the two Motions for Sanctions we filed. Just hours after filing, the Court, surely shocked at the alleged conduct, set a hearing for November 14, 2017. PMIC faces significant legal, economic, and ethical exposure in relation to the Motions.

This is one time, last time, opportunity for PMIC to minimize its exposure and to do the right thing for their insured. This offer will expire on Monday as noted above.

Thank you for conveying this offer, Judge, and please let me know if you or PMIC has any other questions.

Best,

ZANER HARDEN LAW LLP

*/s/ Kurt Zaner*

Kurt Zaner

*/s/ Elliot Singer*

Elliot Singer

1610 WYNKOOP STREET SUITE #120
DENVER CO 80202 | ZANERHARDENLAW.COM
P 303.563.5354 | F 303.563 5061

CONFIDENTIAL

## CONFIDENTIAL RELEASE AND SETTLEMENT AGREEMENT

FOR THE SOLE CONSIDERATION of <u>One Million Dollars and 00/100 cents</u> <u>($1,000,000)</u> lawful money of the United States, payable by Defendant, Pharmacists Mutual Insurance Company, to Plaintiff, KIMBERLY SCHOCK, and her attorneys, Zaner Harden, LLP, the amount and sufficiency of which are hereby acknowledged by Plaintiff, Plaintiff hereby individually, and on behalf of herself, her spouse, heirs, insurers, agents, attorneys, personal representatives, subrogees, and assigns, hereby releases, acquits, and forever discharges Pharmacists Mutual Insurance Company, its agents, partners, shareholders, officers, directors, employees, servants, successors, attorneys, representatives, insurers, subsidiaries, and all related and affiliated companies and/or other entities (collectively "PHMIC"), of and from any and all actions, causes of action, claims and demands for injuries, damages, losses of any kind, penalties, sanctions, costs, attorney fees, expenses, and any other compensation of any kind or amount, on account of, in connection with, arising from, related to, or otherwise in any way growing out of, any and all claimed injuries, damages, claims or losses related to or arising from the following and each of them:

1. Any and all matters relating to, asserted by, or which could have been asserted by Plaintiff, Kimberly Schock ("Plaintiff"), against PHMIC in a lawsuit entitled, *Kimberly Schock v. Pharmacists Mutual Insurance Company*, pending in the United States District Court for the District of Colorado, bearing Civil Action Number 1:17-cv-00592-RM-STV.

2. Any and all claims by Plaintiff against PHMIC for any and all injuries and damages of whatever nature or kind, past, present, and/or future, which occurred, may occur, or will occur, as a result of, arise from, or relate in any way to, an automobile accident occurring on or about March 6, 2014 ("Accident"), as asserted in Plaintiff's Complaint, and which is the subject matter of Plaintiff's lawsuit against PHMIC.



EXHIBIT
4

Page 1 of 6

079
PH0255

3.  Any and all claims made or which could have been made by Plaintiff against PHMIC for benefits arising out of the Accident, including but not limited to all claims made in the action described in Nos. 1 and 2 above, under any policies of insurance issued by PHMIC under which Plaintiff is insured, including but not limited to any and all claims for Uninsured/Underinsured Motorist Benefits and/or other benefit or coverage under any such policies of insurance issued by PHMIC related to the Accident and Plaintiff's claims arising therefrom; and any averments or allegations related to or arising out of the handling of such claim or claims, as set forth in Plaintiff's Complaint, including, but not limited to claims for Uninsured/Underinsured motorist benefits; breach of contract; bad faith breach of contract; common law bad faith; unreasonable delay or denial of benefits; promissory estoppel; violation of statute, including, but not limited to, any claim for statutory double damages and attorney fees under §§ 10-3-1115 and 10-3-1116 C.R.S.; and any and all other claims that Plaintiff alleged, or could have alleged, against PHMIC arising from or related to the Accident.

Plaintiff represents that she is aware of and has been fully and fairly advised by her attorneys of the nature and extent of all injuries and damages resulting from Nos. 1 through 3, above. Plaintiff declares that it is her intention individually, collectively, on behalf of her spouse, and on behalf of her heirs, insurers, agents, attorneys, personal representatives, subrogees, and assigns, to fully, completely, and finally compromise and settle all actions, causes of action, claims and demands, claims for benefits, claims or demands for damages of any type, claims and demands for any and all losses of any kind, loss of any past or future earnings or income, costs, expenses and compensation, on account of all known and unknown injuries and damages resulting, or to result from Nos. 1 through 3, above, against PHMIC. Plaintiff recognizes and acknowledges that in the event there is a change in any applicable law, or if new facts or information is discovered regarding any injuries or damages as a result of the matters set forth in Nos. 1 through 3, above, this Confidential Release and Settlement Agreement will remain in full force and effect, notwithstanding any laws, statutory or common, to the contrary.

CONFIDENTIAL

Plaintiff represents, warrants, and understands that she is fully responsible for, and must resolve and pay from settlement funds, any and all valid and lawful liens in this action, whether presently known, or which become known in the future, including, but not limited to, statutory liens asserted against her by any of the following individuals or entities, including but not limited to any attorney, law firm, finance company, medical provider, governmental entity or program (including but not limited to, Medicare, Medicaid, workers' compensation, or other program), or hospital providing services or treatment to Plaintiff for injuries or damages arising out of or related to the matters set forth in Nos. 1 through 3, above.

Plaintiff further affirms that neither Medicare, Medicaid, nor workers' compensation has been billed for, or has paid for, any medical bills or expenses, lost wages, and/or other services and/or treatment for any injuries or damages arising out of the matters set forth in Nos. 1 through 3, above. In the event and to the extent it is determined or discovered that any such liens exist, Plaintiff and her attorneys further represent, warrant, and understand that Plaintiff is fully responsible for and must resolve and pay, any and all liens arising out of or related to the matters set forth in Nos. 1 through 3, above. Plaintiff hereby acknowledges and is aware that PHMIC is relying on this representation as a material condition of the settlement of this action.

Plaintiff hereby individually, collectively, on behalf of her spouse, heirs, personal representatives, agents, attorneys, insurers, subrogees, and assigns, covenants with PHMIC to defend, indemnify, and save and hold PHMIC harmless from and against any and all claims, actions, causes of action, assignments, and/or liens (including any and all applicable liens, statutory or otherwise, including, but not limited to Medicare, Medicaid, workers compensation, or other governmental entity), on account of, in any way related to, arising from, connected with, or growing out of the matters set forth in Nos. 1 through 3, above.

Page 3 of 6

CONFIDENTIAL

It is expressly understood and agreed that the acceptance and payment of the above-described consideration is in full settlement, resolution, and accord and satisfaction of disputed claims against PHMIC, and that neither the acceptance nor the payment of such consideration is to be construed in any way as an admission of liability by PHMIC for any claim, action, or cause of action asserted in the lawsuit brought by Plaintiff against PHMIC, or of the amount or value of Plaintiff's alleged injuries or damages.

All parties agree that the settlement of this action, which includes the terms and conditions set forth in this Confidential Release and Settlement Agreement, shall not be discussed with any third parties, including representatives of the media or members of the public, with the exception of Plaintiff's spouse, attorneys, insurers, financial consultants, bankers, tax advisors, representatives of federal or state taxing authorities, physicians, psychologists, clergy, upon order of a court of competent jurisdiction, or as otherwise required by applicable laws, ordinances and/or regulation, and with the exception of PHMIC's attorneys, insurers, financial consultants, bankers, tax advisors, representatives of federal or state taxing authorities, appropriate governmental and/or regulatory agencies and authorities, upon order of a court of competent jurisdiction, or as otherwise required by applicable laws, ordinances, and/or regulations, with all parties agreeing that the terms and conditions of this Confidential Release and Settlement Agreement are confidential, except as provided by law.

Plaintiff, by her signature below, acknowledges that she has read this Confidential Release and Settlement Agreement in full, and affirmatively represents that she fully understands the content, terms, provisions, meaning, nature, extent, and effect of this Confidential Release and Settlement Agreement. Plaintiff acknowledges that she is executing this Confidential Release and Settlement of Agreement of her own free will and that by such execution she further

Page 4 of 6

CONFIDENTIAL

acknowledges her understanding and acceptance of the terms and conditions of this Confidential Release and Settlement Agreement.

[Signature Contained on Next Page]

[The Remainder of this Page is Intentionally Left Blank]

083

PH0259

CONFIDENTIAL

Dated this _11_ day of _October_, 2017.

_Kimberly Schock_

KIMBERLY SCHOCK

STATE OF COLORADO        }
                         } ss.
COUNTY OF _Denver_       }

I hereby certify that on this _11_ day of _October_, 2017, the foregoing Confidential Release and Settlement Agreement was executed before me by KIMBERLY SCHOCK, known to me personally to be the individual who executed same.

Witness my hand and official seal.

My commission expires: _10 | 17 | 19_

_Notary Public_

> JENNIFER KOENIG
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20154023863
> MY COMMISSION EXPIRES JUNE 17, 2019

Page 6 of 6

084

PH0260

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-00592-RM-STV

KIMBERLY SCHOCK,

     Plaintiff,

v.

PHARMACISTS MUTUAL INSURANCE COMPANY,

     Defendant.

---

## STIPULATION FOR DISMISSAL WITH PREJUDICE

---

PLEASE TAKE NOTICE, that the parties to the above-captioned action, Plaintiff, Kimberly Schock, and Defendant, Pharmacists Mutual Insurance Company, by and through the undersigned counsel, having fully, finally and completely settled the above-captioned action, hereby stipulate to a dismissal, with prejudice, of all claims that were or could have been brought by Plaintiff against Defendant in this matter, with each party to pay her or its own costs and fees, and hereby request a formal Order of dismissal from the Court.

Dated this 18th day of October, 2017.



EXHIBIT

tabbies

5

Respectfully submitted,

**ZANER HARDEN LAW, LLP**

*S/Kurt Zaner*

_____
Kurt Zaner, Esq.
Elliot Singer, Esq.
1610 Wynkoop Street, Suite 120
Denver, CO 80202
Telephone: (303) 563-5354
E-Mail: kz@zanerhardenlaw.com
es@zanerhardenlaw.com

*Attorneys for Plaintiff*
*[Original Signature on File at the Office Office of Zaner Harden, LLP]*

**WELLS, ANDERSON & RACE, LLC**

*S/Paul D. Dinkelmeyer*

_____
Larry S. McClung, Esq.
Paul D. Dinkelmeyer, Esq.
1700 Broadway, Suite 1020
Denver, CO 80290
Telephone: (303) 830-1212
E-Mail: lmcclung@warllc.com
pdinkelmeyer@warllc.com

*Attorneys for Defendant*
*[Original Signature on File at the Office of Wells, Anderson & Race, LLC]*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of October 2017, I electronically filed and served the foregoing **STIPULATION FOR DISMISSAL WITH PREJUDICE** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record:

Kurt Zaner, Esq.
Elliot Singer, Esq.
ZANER HARDEN LAW, LLP
1610 Wynkoop Street, Suite 120
Denver, Colorado 80202
Email: kz@zanerhardenlaw.com
es@zanerhardenlaw.com

*Attorneys for Plaintiff*

*S/ Kathleen Porter*

_____
Kathleen Porter, Legal Assistant
E-mail: kporter@warllc.com

*[Original Signature on File at the Office of Wells, Anderson & Race, LLC]*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore

Civil Action No. 17-cv-00592-RM-STV

KIMBERLY SCHOCK,

     Plaintiff,

v.

PHARMACISTS MUTUAL INSURANCE COMPANY,

     Defendant.

---

## ORDER OF DISMISSAL WITH PREJUDICE

---

This matter comes before the Court upon the filing of a Stipulation for Dismissal with Prejudice ("Stipulation") (ECF No. 41)by Plaintiff, Kimberly Schock, and Defendant, Pharmacists Mutual Insurance Company, in which the parties stipulate that all claims brought by Plaintiff against Defendant have been fully, finally and completely settled, such that a formal Order of Dismissal with Prejudice is requested from the Court. The Court, having reviewed the Stipulation, there being no opposition thereto, and otherwise being fully advised of the matters contained therein, hereby accepts and grants the Stipulation and ORDERS as follows:

All claims brought or which could have been brought in this action by Plaintiff, Kimberly Schock, against Defendant, Pharmacists Mutual Insurance Company, are hereby dismissed, with prejudice, with each party to bear her or its own attorneys' fees and costs.

DATED this 20th day of October, 2017.

BY THE COURT:

RAYMOND P. MOORE
United States District Court Judge

PHN0204



NAMICO 002117

**NAMIC Insurance Company, Inc.**
3601 Vincennes Road | P. O. Box 68700
Indianapolis, Indiana 46268-0700
(800) 33-NAMIC | Fax (317) 872-5636 | www.namicinsurance.com

November 2, 2017

<u>Via Overnight Mail</u>

Ms. Ivy J. Kitzinger AIS, AINS, ACS, AIC, CPCU
Assistant Vice President of Claims
Pharmacists Mutual Insurance Company
808 HWY 18 W.
PO Box 370
Algona, IA 50511

RE:   Insured:            Pharmacists Mutual Insurance Company
      Policy No:          C01330015
      Claimant:           Kimberly Schock
      NAMICO Claim #:     4286



EXHIBIT
6

**RESERVATION OF RIGHTS**
**BY NAMIC INSURANCE COMPANY**

Dear Ms. Kitzinger:

On behalf of NAMIC Insurance Company, Inc. (NAMICO), this will further acknowledge the above-referenced matter. The undersigned will be handling this claim on behalf of NAMICO. Accordingly, please direct all future correspondence regarding this matter to my attention.

This letter represents our determination regarding the covered portion of the settlement paid in the case captioned <u>Kimberly Schock v. Pharmacists Mutual Insurance Company</u>, United States District Court for the District of Colorado Civil Action No. 1:17-CV-597 (the <u>Schock</u> matter). For the reasons set forth below, NAMICO will tender reimbursement under NAMICO Policy No. C01330015 in the amount of $535,882.08 pursuant to a reservation of all rights as expressed in this letter. This amount is calculated based upon the settlement amount of $1,000,000, plus the previous payment to the underlying claimant, Ms. Kimberly Schock (Schock), in the amount of $217,618.94 [1] along with defense fees and costs incurred to date in the amount of $68,263.14, less the insured's deductible of $250,000 and the uncovered contractual losses of $500,000.

For the protection of Pharmacists Mutual Insurance Company (PHMIC), please take the time to set up a separate file for all communications between PHMIC and NAMICO. This file should be maintained separate from and not as a part of your claim file. By establishing this separate file, communications between NAMICO and PHMIC may retain the privilege of confidentiality accorded by law. This file should include any communications regarding the existence of the NAMICO Policy, including the first notice sent to NAMICO reporting the <u>Schock</u> matter.

---

[1] This amount was paid to Schock in partial settlement of her claim. PHMIC did not notify NAMICO of this offer at the time of the offer was extended and accepted.

088

Under Policy No. C01330015, effective September 30, 2015, through September 30, 2016, (the NAMICO Policy), NAMICO agrees, when there is compliance with the NAMICO Policy terms and conditions, and Exclusions are not applicable, to indemnify and provide defense coverage to PHMIC for CLAIMS resulting from acts, errors, or omissions in the performance of covered PROFESSIONAL SERVICES. The NAMICO Policy carries a $10,000,000 Limit of Liability, subject to a $250,000 each Claim Deductible. Please note that Claim Expense is subject to the $250,000 Deductible and diminishes the Limit of Liability.

Note the Limit of Liability is also the aggregate for the Policy Period. As such, it will be reduced or completely exhausted, by payment of Loss (including Claim Expense) for this or any other Claim that applies to the Policy Period. NAMICO's obligation ceases when the Policy Period Limit of Liability is exhausted.

## DOCUMENTS REVIEWED:

In arriving at our coverage determination, we reviewed the following:

The Complaint in Schock v. Pharmacists Mutual;
The Pharmacists Mutual auto policy insuring the Schock vehicle;
The NAMICO Policy; and
The Demand letter of Kimberly Schock dated September 28, 2017.

## SUMMARY OF PERTINENT ALLEGATIONS OF THE *SCHOCK* COMPLAINT:

On March 6, 2014, Kimberly Schock was in a motor vehicle accident with Stuart Hyma (Hyma). Hyma was an uninsured, at fault driver. Hyma was an excluded driver on his employer's auto liability policy and his employer, Alpine Heavy Duty Repair LLC (Alpine), denied that Hyma was in the course and scope of his employment at the time of the accident.

Schock eventually accepted a settlement offer of $500,0000 from Farmers Insurance Exchange who had issued a garage operations policy to Alpine. The Farmers' garage operations policy issued to Alpine was not deemed to be a "bodily injury policy" so the Hyma vehicle was considered uninsured.

Schock brought suit against PHMIC alleging entitlement to UM benefits under her PHMIC auto insurance policy and pursuant to the Colorado UM/UIM statutes, specifically C.R.S. § 10-4-609. Because the Hyma vehicle was uninsured, there was no threshold of damages Schock needed to reach before the UM benefits under the PHMIC policy were triggered.

Schock maintained that during her communications with PHMIC concerning her claim for UM benefits, PHMIC informed her via telephone the UM coverage in the amount of $100,000 was afforded to five separate vehicles on Schock's policy and would thereby "stack," creating a UM coverage limit of $500,000 for this one accident. Schock maintained PHMIC twice confirmed via telephone that Schock had five UM policies, which stacked for a total of $500,000 in coverage. Schock's attorney requested confirmation in writing and on May 26, 2015, PHMIC wrote to Schock's counsel, indicating it had determined stacking of her UM limits "is allowed as previously

E-FILED  2020 NOV 16 4:07 PM KOSSUTH - CLERK OF DISTRICT COURT

NAMICO 002119

Ms. Ivy J. Kitzinger
*PHMIC – the Schock matter*
November 2, 2017
Page 3 of 6

discussed." Schock also maintained she relied upon confirmation of the stacked coverage limits of $500,000 while seeking medical treatment and funding for medical treatment.

On January 20, 2016, Schock made a formal claim or request to PHMIC for the "full policy limits of $500,000" in UM coverage. Between January and June of 2016, Schock provided PHMIC with copies of her medical records and negotiated with PHMIC towards a settlement of her UM benefits claim. Schock alleges PHMIC repeatedly requested the same medical records be produced, asserting there were missing records necessary for its review of the reasonableness and necessity of her claimed expenses. During this time, PHMIC extended an offer of $283,000.

Schock then alleges that on June 8, 2016, PHMIC informed her it had determined the UM per person limits of $100,000 were not subject to stacking, withdrew its previous offer of $283,000, and tendered $100,000. On June 23, 2016, PHMIC wrote to Schock stating the correct limit of available UM coverage was $100,000, but nonetheless offered to pay her $217,618.94 for expenses that appeared to be reasonably related to the accident. Schock agreed to accept this amount as partial payment, and stated she did not waive her claim for additional benefits under the stacked limits of $500,000.

Schock then brought suit against PHMIC for: 1) UM benefits; 2) breach of contract; 3) delay/denial of her claim for UM benefits under C.R.S. §§ 10-3-1115 and 1116 [2]; and 4) bad faith breach of insurance contract. This suit settled for $1,000,000, plus previously paid UM benefits $217,618.94).

## PERTINENT PROVISIONS OF THE NAMICO POLICY:

NAMICO makes a good faith effort to advise its insureds as to policy terms and conditions which, if certain allegations contained in the Schock matter would be established as true, could limit or negate coverage under the NAMICO Policy. In doing so, NAMICO expresses no opinion as to the truthfulness or validity of the allegations. NAMICO, based on the information received, believes the following terms and conditions may apply to and limit or negate coverage in this matter.

### I. INSURING AGREEMENTS

#### A. Insurance Company Professional Liability

The Insurer will pay on behalf of an **INSURED** all **LOSS** resulting from a **CLAIM** first made against an **INSURED** and reported in writing by an **INSURED** to the Insurer during the **POLICY PERIOD** or applicable Extended Reporting Period, alleging an act, error or omission in the performance of **PROFESSIONAL SERVICES** on or after the **PRIOR ACTS DATE**. A **CLAIM** must be brought in the United States of America, its possessions or territories, Puerto Rico or Canada.

\* \* \*

---

[2] Colorado Revised Statute § 10-3-1115 prohibits the unreasonable delay or denial of payment of claim for benefits owed to any first party claimant. Colorado Revised Statute § 10-3-1116(1) provides for attorney fees and court cost plus two times the contractual benefit as a statutory remedy for unreasonable delay or denial of payment of a claim.

E-FILED 2020 NOV 16 4:07 PM KOSSUTH - CLERK OF DISTRICT COURT

NAMICO 002120

Ms. Ivy J. Kitzinger
*PHMIC – the Schock matter*
November 2, 2017
Page 4 of 6

### III. EXCLUSIONS

**This policy does not apply to:**

I. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to any contract obligation, whether real or alleged, assumed by or imposed upon an **INSURED** arising out of:

1. any policy or contract of insurance, reinsurance, insurance pool, suretyship, annuity or endowment; or

2. any written contract, unless the **INSURED** would have been liable in the absence of such contract;

## DISCUSSION

During the adjustment of the Schock UM claim, PHMIC made representations to Schock concerning the interpretation of her auto policy as allowing the stacking of limits for each of the vehicles insured to provide her with $500,000 of UM coverage. Because Schock alleges she relied upon those representations when making treatment decisions, she has pled the basis for promissory estoppel and equitable estoppel.

Promissory estoppel is a contractual claim. Although Schock did not bring a separate claim for promissory estoppel, she alleged the elements of promissory estoppel in her Complaint.

In addition, Schock pled the basis for implementation of equitable estoppel against PHMIC, the elements of which are nearly identical to promissory estoppel. Equitable estoppel is not a claim, "but rather a defensive doctrine, which may be invoked to bar a party from raising a defense or objection it otherwise would have[.]" *Wheat Ridge Urban Renewal Authority v. Cornerstone Group XXII, L.L.C.,* 176 P.3d 737, 741 (Colo. 2007).

Schock's claim for statutory remedy under Colo.Rev.Stat. § 10-3-1116(1) could have resulted in an award of attorneys' fees and costs plus two times the contractual amount.

In addition, the information on which Schock relied was an interpretation of the terms of her insurance policy as allowing stacking of limits. Therefore, the conduct alleged is intrinsic to the contract itself.

Finally, there does not appear to be any explicit anti-stacking language in the PHMIC policy. Thus, it is unclear what provisions the insured was relying upon when it reversed its position on stacking.

Although there is no definitive opinion, the Colorado courts have described the 2008 amendments to the UM/UIM statute as "pro stacking." *See Jacox v. American Family Mutual Insurance Co.,* 317 P.3d 1242, 1245-46 (Colo.App. 2012). It therefore appears more likely than not that Schock had a viable, contractual based claim (either based on the contract itself or promissory estoppel) or that PHMIC would have been estopped from asserting any anti-stacking language contract

Ms. Ivy J. Kitzinger
PHMIC – the _Schock_ matter
November 2, 2017
Page 5 of 6

defense to the Schock claim. Schock's damages exceeded the $500,000 combined limits of her policy and she more likely than not would have received the full amount.

Accordingly, $500,000 of the amount paid in settlement of the claim is attributable to contract based damages. The NAMICO Policy excludes claims "arising from, based upon, attributable to, or related in any way (directly or indirectly) to any contract obligation, whether real or alleged, assumed by or imposed upon an INSURED arising out of any policy or contract of insurance[.]"

This type of exclusion "distinguishes between liability incurred by [the insured carrier] for breach of contract with [its own] insureds, and liability incurred for negligent acts and omissions committed by [the insured carrier] in handling claims arising from its insurance contracts." _See Scottsdale Insurance Company v. Alabama Municipal Insurance Corp._, 2013 WL 5231928 at *7 (not reported in F.Supp.2d) (M.D. Ala. 2013). The policy indemnifies the insured carrier "only for negligent acts and omissions in [its] handling of claims, not for [its] liability to its insureds for breaching its insurance contracts." _See id._ "In other words, the policy does not require the insurer to take the place of [the insured carrier] with respect to [its own] insurance contracts." _See id._

"[T]he term 'arising from' is construed broadly such that an exclusion precluding insurance coverage for claims arising from a contract not only applies to claims sounding directly in contract, but also to claims sounding in tort as long as they 'flowed from or had their origins in the breach of the contract.' " _Spirtas Co. v. Federal Ins. Co._, 521 F.3d 833, 835 (8th Cir. 2008); _see also, Pacific Ins. Co., Ltd. v. Eaton Vance Management_, 369 F.3d 584, 590 (1st Cir. 2004) ("The refusal to pay an obligation simply is not the cause of the obligation, and the insured's wrongful act in this case did not result in their obligation to pay; its contract imposed on it the obligation to pay."); _Baylor Heating & Air Conditioning, Inc. v. Federated Mut. Ins. Co._, 987 F.2d 415, 420 (7th Cir. 1993) (upholding a contract exclusion and noting that under the insured's logic "any default arising from a mistaken assumption regarding one's contractual liability could be transformed into an insured event").

CONCLUSION:

Based on the above, NAMICO will tender $535,882.08 to the insured under the NAMICO Policy for covered losses under a full reservation of its rights to assert additional coverage defenses and exclusions. As noted above, this amount is calculated based upon the settlement amount of $1,000,000, PHMIC's prior payment to Schock in the amount of $217,618.94, and defense fees and costs which have been estimated to be $68,263.14. This will fulfill NAMICO's indemnity obligation for covered losses incurred once the applicable deductible ($250,000) and the uncovered contractual losses ($500,000) have been subtracted from the settlement amount, total paid to Schock, and defense fees and expenses. Tender of this payment is not a waiver of any other defenses NAMICO may have to this claim and NAMICO specifically and expressly reserves and does not waive the right to assert any such defenses, whether contractual or extra-contractual, and the right to assert any policy defenses in addition to the policy provisions cited herein.

After considering the contents of this letter, PHMIC may wish to obtain the services of its own attorney, at its expense, to protect its interests to the extent that the claims asserted against PHMIC may be uninsured because of lack of coverage.

Ms. Ivy J. Kitzinger
*PHMIC – the Schock matter*
November 2, 2017
Page 6 of 6

If I may provide any further information to you at this time, or if you would like clarification of any portion of this letter, or if you have any additional information you feel is relevant to either the Schock matter or coverage issues, please contact me immediately.

In closing, NAMICO wishes to reiterate it does not mean to imply any of the allegations contained in the Schock matter are true or correct. Rather, such allegations have been referenced for the sole purpose of making initial coverage determinations under the NAMICO Policy.

Please contact me if you have any questions.

Sincerely,

Jennifer M. Hamilton, Esq.

Director – Claims Department
NAMIC Insurance Company, Inc. (NAMICO)
(317) 876-4309 (Direct)
JHamilton@NAMIC.org

IN THE IOWA DISTRICT COURT FOR KOSSUTH COUNTY

| | |
|---|---|
| PHARMACISTS MUTUAL INSURANCE COMPANY, | Case No. _____ |
| Plaintiff, | |
| v. | **AFFIDAVIT OF IDENTITY** |
| NAMIC INSURANCE COMPANY, INC., | |
| Defendant. | |

STATE OF IOWA, COUNTY OF POLK, SS:

I, Drew J. Gentsch, being first duly sworn on my oath, do depose and state that I am an attorney licensed to practice law in the State of Iowa, and currently practicing as a Member of the law firm of Whitfield & Eddy, P.L.C., 699 Walnut Street, Suite 2000, Des Moines, Iowa 50309.

I am the attorney of record for the Plaintiff, Pharmacists Mutual Insurance Company, in the above-captioned action.

I state, to the best of my knowledge, information and belief, the full name and address of the Defendant is as follows:

NAMIC INSURANCE COMPANY, INC.
3601 Vincennes Rd.
PO Box 68700
INDIANAPOLIS, IN 46268

I state, to the best of my knowledge, information and belief, the occupation of said

Page **1** of **2**

Defendant, as named above, is providing insurance.

By: _____
Drew J. Gentsch

Subscribed to and sworn before me by the said Drew J. Gentsch this _16_ day of November, 2020.

Notary Public in and for the State of Iowa

DEBRA K. MOTHERSHED
Commission Number 729605
My Commission Expires
07-22-2022

Page **2** of **2**

095

IN THE IOWA DISTRICT COURT FOR KOSSUTH COUNTY

| | |
|---|---|
| PHARMACISTS MUTUAL INSURANCE COMPANY, | Case No. _____ |
| Plaintiff, | |
| v. | **ORIGINAL NOTICE** |
| NAMIC INSURANCE COMPANY, INC., | |
| Defendant. | |

**TO:  NAMIC Insurance Company, Inc., 3601 Vincennes Rd., PO Box 68700, Indianapolis, IN 46268**

You are hereby notified that there is now on file in the office of the Clerk of the above court a Petition in the above-entitled action, a copy of which is attached hereto (along with copies of any documents filed with it). The attorney filing the Petition is Drew J. Gentsch of Whitfield & Eddy, P.L.C., whose address is 699 Walnut St., Suite 2000, Des Moines, Iowa 50309, and whose phone number is 515-288-6041.

This case has been filed in a county that utilizes electronic filing.  General rules and information on electronic filing are contained in Iowa Court Rules Chapter 16.  Information regarding requirements related to the protection of personal information in court filings is contained in Iowa Court Rules Chapter 16, Division VI.  You must serve a motion or answer within 60 days after service of this Original Notice upon you by using the Iowa Judicial Branch Electronic Document Management System (EDMS) at www.iowacourts.state.ia.us/efile, unless you obtain from the court an exemption from electronic filing requirements.  If you do not file

1

096

your appearance, motion or answer within 60 days from the date you are served with this Original Notice, judgment by default will be rendered against you for the relief demanded in the application.

     KOSSUTH COUNTY CLERK OF COURT
     114 W State St # 10
     Algona, IA 50511

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA Coordinator at 1-712-279-6035. (If you are hearing impaired, call Relay Iowa TTY at 1-800-735-2942).  Disability coordinators cannot provide legal advice.

2

097

# STATE OF IOWA JUDICIARY

*Case No.* LACV027507

*County* Kossuth

*Case Title* PHARMACISTS MUTUAL INS. CO. V. NAMIC INS. CO., INC

**THIS CASE HAS BEEN FILED IN A COUNTY THAT USES ELECTRONIC FILING.**
Therefore, unless the attached Petition and Original Notice contains a hearing date for your appearance, or unless you obtain an exemption from the court, you must file your Appearance and Answer electronically.

You must register through the Iowa Judicial Branch website at http://www.iowacourts.state.ia.us/Efile and obtain a log in and password for the purposes of filing and viewing documents on your case and of receiving service and notices from the court.

**FOR GENERAL RULES AND INFORMATION ON ELECTRONIC FILING, REFER TO THE IOWA COURT RULES CHAPTER 16 PERTAINING TO THE USE OF THE ELECTRONIC DOCUMENT MANAGEMENT SYSTEM:**
http://www.iowacourts.state.ia.us/Efile

**FOR COURT RULES ON PROTECTION OF PERSONAL PRIVACY IN COURT FILINGS, REFER TO DIVISION VI OF IOWA COURT RULES CHAPTER 16:** http://www.iowacourts.state.ia.us/Efile

*Scheduled Hearing:*

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA coordinator at **(712) 279-6035**   .  (If you are hearing impaired, call Relay Iowa TTY at **1-800-735-2942**.)

*Date Issued*  11/17/2020 08:57:31 AM



*District Clerk of*  Kossuth                    *County*

/s/ Anne Kiess

Rule 31.25—Form 1: *Application for Admission Pro Hac Vice--District Court*

## Iowa District Court for KOSSUTH County

*County where your case is filed*

Pharmacists Mutual Insurance Company,

**Plaintiff(s)**
*Full name: first, middle, last*

vs.

NAMIC Insurance Company, Inc.,

**Defendant(s)**
*Full name: first, middle, last*

Case no. LACV027507

### Application for Admission Pro Hac Vice--District Court
Iowa Court Rule 31.14

### 1. Application

The undersigned seeks permission to appear pro hac vice in the above-captioned proceeding.
*Applicant must complete all of the following:*
If this matter involves review of an agency action, did the applicant seek admission pro hac vice in the proceedings below? ☐ Yes ☐ No
*If yes, attach copies of all related documents.*

a. Applicant's full name, residential address, email address, and business address.

| Dennis Bartlett | dennis@bbl.law | | |
|---|---|---|---|
| *Full name: first, middle, last* | *Email address* | | |
| 6455 South Yosemite Street, Suite 750 | Greenwood Village | CO | 80111 |
| *Mailing address* | *City* | *State* | *ZIP code* |
| Same | | | |
| *Business address* | *City* | *State* | *ZIP code* |

b. The name, address, and telephone number of each client to be represented.
Pharmacists Mutual Insurance Company, 808 US Hwy 18 West, PO Box 370, Algona, IA 50511

c. The courts before which the applicant has been admitted to practice and the respective periods of admission and any jurisdiction in which the out-of-state lawyer has been licensed to practice as a foreign legal consultant and the respective period of licensure. 1940 Colorado 11-1-1965 to Present; U.S. D. Ct. Colorado, 10th Circuit; U.S. Colorado Court 1989; U.S. D. Ct. Nev. 2002; U.S. Ct. D App. 9th Cir. 2002

d. Has the applicant ever been denied admission pro hac vice in this state?
☐ Yes ☒ No

---

January 2017      Rule 31.25—Form 1      Page 1 of 4

Rule 31.25—Form 1: *Application for Admission Pro Hac Vice--District Court*, continued

*If yes, on a separate page specify the caption of the proceedings, the date of the denial, and what findings were made. Attach copies of all related documents.*

e.   Has the applicant ever had admission pro hac vice revoked in this state?

☐ Yes  ☒ No

*If yes, on a separate page specify the caption of the proceedings, the date of the denial, and what findings were made. Attach copies of all related documents.*

f.   Has the applicant ever been denied admission in any jurisdiction for reasons other than failure of a bar examination?  ☐ Yes  ☒ No

*If yes, on a separate page specify the caption of the proceedings, the date of the denial, and what findings were made. Attach copies of all related documents.*

g.   Has the applicant ever been formally disciplined or sanctioned by any court in this state?  ☐ Yes  ☒ No

*If yes, on a separate page specify the nature of the allegations, the name of the authority bringing such proceedings, the caption of the proceedings, the date filed, what findings were made, and what action was taken in connection with those proceedings. Attach copies of all related documents.*

h.   Has the applicant ever been the subject of any injunction, cease-and-desist letter, or other action arising from a finding that the applicant engaged in the unauthorized practice of law in this state or elsewhere?  ☐ Yes  ☒ No

*If yes, on a separate page specify the nature of the allegations, the name of the authority bringing such proceedings, the caption of the proceedings, the date filed, what findings were made, and what action was taken in connection with those proceedings. Attach copies of all related documents.*

i.   Has any formal, written disciplinary proceeding ever been brought against the applicant by a disciplinary authority or unauthorized practice of law commission in any other jurisdiction within the last five years?  ☐ Yes  ☒ No

*If yes, on a separate page specify as to each such proceeding: the nature of the allegations, the name of the person or authority bringing such proceedings, the date the proceedings were initiated and finally concluded, the style of the proceedings, and the findings made and actions taken in connection with those proceedings. Attach copies of all related documents.*

j.   Has the applicant ever been placed on probation by a disciplinary authority in any other jurisdiction?  ☐ Yes  ☒ No

*If yes, on a separate page specify the jurisdiction, caption of the proceedings, the terms of the probation, and what findings were made. Attach copies of all related documents.*

k.   Has the applicant ever been held formally in contempt or otherwise sanctioned by any court in a written order in the last five years for disobedience to the court's rules or orders?  ☐ Yes  ☒ No

*If yes, on a separate page specify the nature of the allegations, the name of the court before which such proceedings were conducted, the date of the contempt order or sanction, the caption of the proceedings, and the substance of the court's rulings. Attach to this application a copy of the written order or a transcript of the oral ruling and other related documents.*

l.   Has the applicant filed an application to appear pro hac vice in this state within the preceding two years?  ☐ Yes  ☒ No

Rule 31.25—Form 1: *Application for Admission Pro Hac Vice--District Court*, continued

*If yes, on a separate page list the name and address of each court or agency and a full identification of each proceeding in which an application was filed, including the date and outcome of the application. Attach copies of all related documents.*

m. The applicant acknowledges familiarity with the rules of professional conduct, the disciplinary procedures of this state, the standards for professional conduct, the applicable local rules, and the procedures of the court before which the applicant seeks to practice. ☒ Yes ☐ No

n. List the name, address, telephone number, email address, and personal identification number of an in-state lawyer in good standing of the bar of this state who will sponsor the applicant's pro hac vice request.

Drew J. Gentsch  AT0002739  GentschpWhitfieldLaw.com
*Lawyer's name*  *PIN*  *Email address*

6999 Walnut St. Suite 2000  Des Moines  Iowa  50309
*Lawyer's address*  *City*  *State*  *ZIP code*

o. The applicant acknowledges that service upon the in-state attorney in all matters connected with the proceedings will have the same effect as if personally made upon the applicant. ☒ Yes ☐ No

p. If the applicant has appeared pro hac vice in this state in five proceedings within the preceding two years, the applicant must, on a separate attached page, provide a statement showing good cause why the applicant should be admitted in the present proceeding.

q. On a separate attached page the applicant must provide any other information the applicant deems necessary to support the application for admission pro hac vice.

r. Has the applicant registered with the office of professional regulation and paid the fee as required by Iowa Court Rule 31.14(11) within five years of the date of this application? ☒ Yes ☐ No

**Lawyer's Oath and Signature and Certificate of Service on next page**

Rule 31.25—Form 1: *Application for Admission Pro Hac Vice--District Court*, continued

## 2. Oath and Signature

I, __Dennis Bartlett_____, have read this Application, and I certify under
    *Print your name*

penalty of perjury and pursuant to the laws of the State of Iowa that the preceding is true and correct.

November _____, 20 20
*Signed on:*   *Month*     *Day*     *Year*     *Your signature\**

6455 South Yosemite Street, Suite 750     Greenwood Village     CO     80111
*Mailing address*                  *City*               *State*     *ZIP code*

(303) 515-2481     dennis@bbl.law
*Telephone number*        *Email address*            *Additional email address, if applicable*

\* *If filing in paper, you must handwrite your signature on this form. If filing electronically, you may handwrite your signature on the form, scan the form, and then file it electronically, or, you may affix a digitized signature and file the form electronically.*

## Certificate of Service

The undersigned certifies a copy of this application was served on the following parties:

on the _____ day of _____, 20_____
                *Month*         *Year*

by ☐ Personal delivery     ☐ Deposit in the U.S. mail

_____
*Signature of server*

IN THE IOWA DISTRICT COURT FOR KOSSUTH COUNTY

| | |
|---|---|
| PHARMACISTS MUTUAL INSURANCE COMPANY, | Case No. <u>LACV027507</u> |
| Plaintiff, | |
| v. | **ACCEPTANCE OF SERVICE** |
| NAMIC INSURANCE COMPANY, INC., | |
| Defendant. | |

The undersigned, Timothy F. Sullivan, hereby acknowledges and accepts service of the Original Notice and Petition, in the above-captioned matter, in due and legal form on behalf of the Defendant, NAMIC Insurance Company, Inc.

Dated: November 30, 2020.

By: 

Timothy F. Sullivan
President & CEO
AUTHORIZED REPRESENTATIVE OF NAMIC
INSURANCE COMPANY, INC.

Subscribed to and sworn before me by the said _Lenora L. Adams_ this _30th_ day of November, 2020.



LENORA L. ADAMS
Hamilton County
My Commission Expires
September 17, 2023

_Lenora L Adams_
Notary Public in and for the State of _Indiana_

## IN THE IOWA DISTRICT COURT FOR KOSSUTH COUNTY

| | |
|---|---|
| PHARMACISTS MUTUAL INSURANCE COMPANY | 03551  LACV027507 |
| Plaintiff | |
| VS | **ORDER** |
| NAMIC INSURANCE COMPANY, INC | ORDER DENYING APPLICATION FOR ADMISSION PRO HAC VICE |
| Defendant | |

Now on this day, this matter comes before the Court on an Application filed by counsel for Plaintiff for admission under Iowa Court Rule 31.14. The Court has reviewed the Application and finds the Application fails to provide proof of service of application to all parties who have appeared in the in the proceedings nor does the application provide proof of service of the same. The applicant is directed to review Iowa Court Rule 31.14(4).

The Application for Pro Hoc Vice is DENIED.

 Copy Provided to Defendant
 Copy Provided to Plaintiff

If you need assistance to participate in court due to a disability, call the disability coordinator at (712) 279-6035 or information at https://www.iowacourts.gov/for-the-public/ada/. Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942). **Disability coordinators cannot provide legal advice.**



State of Iowa Courts

**Case Number**  **Case Title**
LACV027507   PHARMACISTS MUTUAL INS. CO. V. NAMIC INS. CO., INC
**Type:**     OTHER ORDER

So Ordered



Shayne Mayer, District Court Judge
Third Judicial District of Iowa

Electronically signed on 2020-12-05 13:42:25

Rule 31.25—Form 1: *Application for Admission Pro Hac Vice--District Court*

## Iowa District Court for _____ KOSSUTH _____ County

*County where your case is filed*

| | |
|---|---|
| Pharmacists Mutual Insurance Company, | Case no. **LACV027507** |
| **Plaintiff(s)** *Full name: first, middle, last* vs. NAMIC Insurance Company, Inc., | **Application for Admission Pro Hac Vice--District Court** Iowa Court Rule 31.14 |
| **Defendant(s)** *Full name: first, middle, last* | |

### 1. Application

The undersigned seeks permission to appear pro hac vice in the above-captioned proceeding.
*Applicant must complete all of the following:*
If this matter involves review of an agency action, did the applicant seek admission pro hac vice in the proceedings below? ☐ Yes ☐ No
*If yes, attach copies of all related documents.*

a. Applicant's full name, residential address, email address, and business address.

| Dennis Bartlett | dennis@bbl.law | | |
|---|---|---|---|
| *Full name: first, middle, last* | *Email address* | | |
| 6455 South Yosemite Street, Suite 750 | Greenwood Village | CO | 80111 |
| *Mailing address* | *City* | *State* | *ZIP code* |
| Same | | | |
| *Business address* | *City* | *State* | *ZIP code* |

b. The name, address, and telephone number of each client to be represented.
Pharmacists Mutual Insurance Company, 808 US Hwy 18 West, PO Box 370, Algona, IA 50511

c. The courts before which the applicant has been admitted to practice and the respective periods of admission and any jurisdiction in which the out-of-state lawyer has been licensed to practice as a foreign legal consultant and the respective period of licensure. *Colorado 11-1-1965 - to present; U.S. D. Ct. Colorado, 10th Circuit; U.S. Colorado Court 1989; U.S. D.C. Nev. 2002; U.S. Ct. of App. 9th cir. 2002*

d. Has the applicant ever been denied admission pro hac vice in this state?
☐ Yes ☒ No

---

| January 2017 | Rule 31.25—Form 1 | Page 1 of 4 |
|---|---|---|

Rule 31.25—Form 1: *Application for Admission Pro Hac Vice--District Court*, continued

*If yes, on a separate page specify the caption of the proceedings, the date of the denial, and what findings were made. Attach copies of all related documents.*

e. Has the applicant ever had admission pro hac vice revoked in this state?

☐ Yes ☒ No

*If yes, on a separate page specify the caption of the proceedings, the date of the denial, and what findings were made. Attach copies of all related documents.*

f. Has the applicant ever been denied admission in any jurisdiction for reasons other than failure of a bar examination? ☐ Yes ☒ No

*If yes, on a separate page specify the caption of the proceedings, the date of the denial, and what findings were made. Attach copies of all related documents.*

g. Has the applicant ever been formally disciplined or sanctioned by any court in this state? ☐ Yes ☒ No

*If yes, on a separate page specify the nature of the allegations, the name of the authority bringing such proceedings, the caption of the proceedings, the date filed, what findings were made, and what action was taken in connection with those proceedings. Attach copies of all related documents.*

h. Has the applicant ever been the subject of any injunction, cease-and-desist letter, or other action arising from a finding that the applicant engaged in the unauthorized practice of law in this state or elsewhere? ☐ Yes ☒ No

*If yes, on a separate page specify the nature of the allegations, the name of the authority bringing such proceedings, the caption of the proceedings, the date filed, what findings were made, and what action was taken in connection with those proceedings. Attach copies of all related documents.*

i. Has any formal, written disciplinary proceeding ever been brought against the applicant by a disciplinary authority or unauthorized practice of law commission in any other jurisdiction within the last five years? ☐ Yes ☒ No

*If yes, on a separate page specify as to each such proceeding: the nature of the allegations, the name of the person or authority bringing such proceedings, the date the proceedings were initiated and finally concluded, the style of the proceedings, and the findings made and actions taken in connection with those proceedings. Attach copies of all related documents.*

j. Has the applicant ever been placed on probation by a disciplinary authority in any other jurisdiction? ☐ Yes ☒ No

*If yes, on a separate page specify the jurisdiction, caption of the proceedings, the terms of the probation, and what findings were made. Attach copies of all related documents.*

k. Has the applicant ever been held formally in contempt or otherwise sanctioned by any court in a written order in the last five years for disobedience to the court's rules or orders? ☐ Yes ☒ No

*If yes, on a separate page specify the nature of the allegations, the name of the court before which such proceedings were conducted, the date of the contempt order or sanction, the caption of the proceedings, and the substance of the court's rulings. Attach to this application a copy of the written order or a transcript of the oral ruling and other related documents.*

l. Has the applicant filed an application to appear pro hac vice in this state within the preceding two years? ☐ Yes ☒ No

Rule 31.25—Form 1: *Application for Admission Pro Hac Vice--District Court*, continued

*If yes, on a separate page list the name and address of each court or agency and a full identification of each proceeding in which an application was filed, including the date and outcome of the application. Attach copies of all related documents.*

m.  The applicant acknowledges familiarity with the rules of professional conduct, the disciplinary procedures of this state, the standards for professional conduct, the applicable local rules, and the procedures of the court before which the applicant seeks to practice. ☒Yes ☐ No

n.  List the name, address, telephone number, email address, and personal identification number of an in-state lawyer in good standing of the bar of this state who will sponsor the applicant's pro hac vice request.

Drew J. Gentsch ___ AT0002739 ___ Gentsch@WhitfieldLaw.com
Lawyer's name / PIN / Email address

6999 Walnut St. Suite 2000 ___ Des Moines ___ Iowa ___ 50809
Lawyer's address / City / State / ZIP code

o.  The applicant acknowledges that service upon the in-state attorney in all matters connected with the proceedings will have the same effect as if personally made upon the applicant. ☒Yes ☐ No

p.  If the applicant has appeared pro hac vice in this state in five proceedings within the preceding two years, the applicant must, on a separate attached page, provide a statement showing good cause why the applicant should be admitted in the present proceeding.

q.  On a separate attached page the applicant must provide any other information the applicant deems necessary to support the application for admission pro hac vice.

r.  Has the applicant registered with the office of professional regulation and paid the fee as required by Iowa Court Rule 31.14(11) within five years of the date of this application? ☒ Yes ☐ No

**Lawyer's Oath and Signature and Certificate of Service on next page**

108

Rule 31.25—Form 1: *Application for Admission Pro Hac Vice--District Court*, continued

## 2. Oath and Signature

I, _Dennis Bartlett_____, have read this Application, and I certify under
*Print your name*

penalty of perjury and pursuant to the laws of the State of Iowa that the preceding is
true and correct.

November _____ 20 20 _____
*Signed on:* *Month* *Day* *Year* *Your signature\**

6455 South Yosemite Street, Suite 750 _____ Greenwood Village ____ CO ___ 80111 _____
*Mailing address* *City* *State* *ZIP code*

(303___) 515-2481 _____ dennis@bbl.law _____ _____
*Telephone number* *Email address* *Additional email address, if applicable*

\* *If filing in paper, you must handwrite your signature on this form. If filing electronically, you may handwrite your signature on the form, scan the form, and then file it electronically, or, you may affix a digitized signature and file the form electronically.*

### Certificate of Service

The undersigned certifies a copy of this application was served on the following parties:

Timothy F. Sullivan, President/CEO
NAMIC Insurance Company, Inc.
3601 Vincennes Rd., PO Box 68700
Indianapolis, IN 46268

on the _7th___ day of _December___, 20 20 ___
*Month* *Year*

by ☐ Personal delivery ☒ Deposit in the U.S. mail

Email courtesy copy to Mike Weston and
Brenda Wallrichs as counsel for NAMIC Ins. Co. Inc.

Mike Weston at: **mweston@lwclawyers.com**
Brenda Wallrichs at: bwallrichs@lwclawyers.com

Email copy to:

Dennis Bartlett
Email: dennis@bbl.law

/s/ Karen A. Wilson
_____
Signature of Server
Karen A. Wilson, Assistant to
Drew J. Gentsch, Whitfield & Eddy, PLC
699 Walnut Street, Suite 2000
Des Moines, IA 50309
Telephone: (515) 288-6041
Fax: (515) 246-1474

IN THE IOWA DISTRICT COURT FOR KOSSUTH COUNTY

| | |
|---|---|
| PHARMACISTS MUTUAL INSURANCE COMPANY, | Case No.  <u>LACV027507</u> |
| Plaintiff, | |
| v. | |
| | **ORDER APPROVING APPLICATION FOR ADMISSION PRO HAC VICE** |
| NAMIC INSURANCE COMPANY, INC., | |
| Defendant. | |

The above-captioned case comes to the attention of the Court this date. There is now pending in this case an Application for Admission Pro Hac Vice. The Court notes the application has been on file without objection. Upon review, the Court does find cause to grant the application.

**IT IS THE ORDER OF THE COURT** the "Application for Admission Pro Hac Vice" as to Attorney, Dennis Bartlett, is **GRANTED.**  The Court notes that counsel will be providing representation to Plaintiff, Pharmacists Mutual Insurance Company and is admitted to practice before this court for this case only.

**IT IS FURTHER ORDERED**, Counsel shall comply with all pertinent Iowa Rules of Court and the duties imposed by Rule 31.14(3) and shall register with the Office of Professional Regulation and pay a fee of $250 to the client security trust fund as required by Rule 31.14(11).

The Clerk of Court shall provide a copy of this Order to counsel of record.

**ORDERED** this 8th day of December, 2020.



State of Iowa Courts

**Case Number**       **Case Title**
LACV027507       PHARMACISTS MUTUAL INS. CO. V. NAMIC INS. CO., INC
**Type:**       OTHER ORDER

So Ordered



Shayne Mayer, District Court Judge
Third Judicial District of Iowa

Electronically signed on 2020-12-08 09:44:01

111

# CLERK OF DISTRICT COURT

KOSSUTH COUNTY COURTHOUSE
114 WEST STATE STREET STE #10
ALGONA IA 50511-2698
(515) 295-3240

## Notice to Attorney Admitted Pro Hac Vice

As indicated in the attached notice, this case is in electronic format. As an attorney admitted pro hac vice on the case, you need to follow some special steps to register for e-filing.

When you register, select the Pro Hac Vice option under User Role. On the page where you enter your User Account information, enter the information according to the instructions, with the special exception that you enter the PHV PIN we have assigned to you in the ICIS ID field. Complete your account registration.

**Chapter 16 Rules and eFiling training documents are available at:**
http://www.iowacourts.gov/eFiling/Training_Documents/

Failure to register means you will not receive electronic service on this case.

**Your uniquely assigned pro hac vice pin is: PHV002729**

**Name: DENNIS BARTLETT**

**Case: 03551  LACV027507**

# IN THE IOWA DISTRICT COURT FOR KOSSUTH COUNTY

Case No.: 03551  LACV027507

## Notice of Electronic Filing Requirement

YOU ARE HEREBY NOTIFIED THAT YOU ARE ATTEMPTING TO FILE IN A COUNTY THAT
UTILIZES ELECTRONIC FILING.  YOUR PAPER FILINGS ARE BEING RETURNED TO YOU
AND HAVE NOT BEEN ACCEPTED AT THIS OFFICE.

You are required to register through the Iowa Judicial Branch website at
https://www.iowacourts.state.ia.us/EFile/ and obtain a log in and password for the purposes of filing and
viewing documents on your case and of receiving notification of filings, court rulings and events.  REFER
TO THE IOWA COURT RULES CHAPTER 16 PERTAINING TO THE USE OF THE ELECTRONIC
DOCUMENT MANAGEMENT SYSTEM (EDMS).  For court rules on the protection of personal information
in court filings, refer to Division VI of Iowa Court Rules Chapter 16.

ELECTRONIC FILING IS MANDATORY:

Electronic filing of new court cases and filings in cases that have been converted to electronic is mandatory in
counties where the EDMS has been implemented, unless otherwise required or authorized by the Chapter16:
Rules Pertaining to the Use of the Electronic Document Management System.

YOU MUST REGISTER TO USE EDMS:

Registration is required before you can use the EDMS.  You are required to have a current e-mail account for
use with EDMS.  When you have completed your registration and received you login (username) and password,
you can begin filing and receiving documents immediately.  Your registration constitutes your request for, and
consent to, electronic service of court-generated documents and documents filed electronically by other parties.

EXCEPTIONS:

For good cause, the court, or clerk if no judge is available, may authorize a filer to submit a document in paper.
Upon showing of exceptional circumstances, the chief judge of the district in which a case is pending may grant
you an exemption from registering and filing electronically.

READ CHAPTER 16: RULES PERTAINING TO THE USE OF THE ELECTRONIC DOCUMENT
MANAGEMENT SYSTEM (EDMS), available on the Iowa Judicial Branch Filer's Interface at https://
www.iowacourts.state.ia.us/EFile/, before you register for or use the Electronic Document Management
System.

IN THE IOWA DISTRICT COURT FOR KOSSUTH COUNTY

| | |
|---|---|
| PHARMACISTS MUTUAL INSURANCE COMPANY,<br><br>      Plaintiff,<br><br>v.<br><br>NAMIC INSURANCE COMPANY, INC.,<br><br>      Defendant. | Case No.: <u>LACV027507</u><br><br><br>**PLAINTIFF'S NOTICE OF SERVICE** |

COMES NOW Drew J. Gentsch, attorney for Plaintiff, Pharmacists Mutual Insurance

Company, and states the following regarding service:

     1.    The Application for Admission Pro Hac Vice filed December 7, 2020; the Order

Granting Motion for Admission Pro Hac Vice filed December 8, 2020; and the Notice to Attorney

Admitted Pro Hac Vice filed December 9, 2020, were sent via U.S. Mail to:

     Timothy F. Sullivan, President/CEO, NAMIC Insurance Company, Inc.,
     3601 Vincennes Rd., PO Box 68700, Indianapolis, IN 46268;

and to the following email addresses on December 14, 2020:

     Dennis Bartlett, Lead Counsel for Pharmacists Mutual Insurance Company, at:
dennis@bbl.law; and

     Courtesy email copy to Mike Weston and Brenda Wallrichs, as counsel for NAMIC
Ins. Co. Inc., Mike Weston at:  **mweston@lwclawyers.com** and Brenda Wallrichs at:
bwallrichs@lwclawyers.com.

     WHITFIELD & EDDY, P.L.C.
     699 Walnut Street, Suite 2000
     Des Moines, IA 50309
     Telephone:  (515) 288-6041
     Fax:  (515) 246-1474
     Email: gentsch@whitfieldlaw.com

     By: */s/ Drew J. Gentsch*

Drew J. Gentsch
ATTORNEYS FOR PLAINTIFF

Original filed.

Copy via U. S. Mail:

Timothy F. Sullivan, President/CEO
NAMIC Insurance Company, Inc.
3601 Vincennes Rd., PO Box 68700
Indianapolis, IN 46268

Copy via email to:

Dennis Bartlett
Pharmacists Mutual Insurance Company
Email: dennis@bbl.law

Courtesy Copies via email to:

Email courtesy copy to Mike Weston and
Brenda Wallrichs as counsel for NAMIC Ins. Co. Inc.

Mike Weston at:  **mweston@lwclawyers.com**
Brenda Wallrichs at: bwallrichs@lwclawyers.com

---

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument
was served upon all parties to the above cause or to
each of the attorneys of record herein at their respective
addresses disclosed on the pleadings on December 14,
2020.

By: **X** U. S. Mail      **X** eMail
    ❑ Hand Delivered      ❑ Overnight Courier
    ❑ Certified Mail      **X** Other: EDMS
    ❑ FAX

Signature _/s/ Karen A. Wilson_____

---